**Willard NELSON, Plaintiff,**

v.

**John W. GARDNER, Secretary of Health, Education, and Welfare, Defendant.**

**Civ. A. No. 2319.**

United States District Court
S. D. West Virginia,
Huntington Division.

Aug. 9, 1967.

Howard H. Moore, Louisa, Ky., Toney E. Cline, Charleston, W. Va., for plaintiff.

Milton J. Ferguson, U. S. Atty., George D. Beter, Asst. U. S. Atty., Huntington, W. Va., for defendant.

CHRISTIE, District Judge:

This is an action under Section 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g), to review a final decision of the Secretary of Health, Education, and Welfare. A decision by a hearing examiner on November 30, 1966 became the final decision of the Secretary on January 18, 1967, when the Appeals Council denied plaintiff's request for review. The final decision holds that plaintiff is not en-

titled to the establishment of a period of disability or disability insurance benefits under the provisions of the Act prior or subsequent to the 1965 Amendments.[1]

█ Plaintiff last met the special earnings requirements of the Social Security Act as of June 30, 1958. Under the Act, 42 U.S.C.A. § 416(i), an individual shall not be considered to be under a disability unless he furnishes such proof of the existence thereof as may be required. Thus, the burden is upon the plaintiff to establish by credible evidence that he was disabled within the meaning of the Act prior to June 30, 1958, when he last met the insured status, though it need not be carried beyond a reasonable doubt. Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964).

█ The standard of review in actions of this nature is found in Section 205(g) of the Act, as amended, and is as follows:

"The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * *."

In short, the Courts are not to try the case de novo, and if the findings of the Secretary are supported by substantial evidence, the Courts are bound to accept them. Underwood v. Ribicoff, 298 F.2d 850 (4th Cir. 1962). Nevertheless, it is said that this provision of the law does not contemplate that the Courts should surrender their "traditional function," but rather that they will view the record as a whole, not for the purpose of making an independent finding, but to determine whether or not the administrative finding is supported by substantial evidence and to see to it that the administrative

agency does not act arbitrarily or capriciously in denying just claims or allowing unworthy ones. Thomas v. Celebrezze, supra; Underwood v. Ribicoff, supra; Snyder v. Ribicoff, 307 F.2d 518 (4th Cir. 1962). In determining the meaning of "substantial evidence," the Courts have held it to be more than a scintilla, but less than a preponderance. Thomas v. Celebrezze, supra. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be based on the record as a whole. Celebrezze v. Bolas, 316 F.2d 498 (8th Cir. 1963). The Fourth Circuit has pointed out that if there is only a slight preponderance of the evidence on one side or the other, the Secretary's findings must be affirmed. Underwood v. Ribicoff, supra. Therefore, the immediate task of this Court on this review is to determine whether the defendant's denial of the plaintiff's claim is supported by substantial evidence.

█ Plaintiff's present application was filed March 22, 1966, alleging that he became disabled in March 1956, as a result of his "Lung, Heart, etc. condition." He had previously filed an application on April 13, 1961, also alleging that he became unable to work in March 1956, because of "spinal injury-hernia." This application was denied by a hearing examiner on October 26, 1962, as was his request for review by the Appeals Council. Plaintiff did not seek a review of this decision in the District Court. The Social Security Regulation, 20 C.F.R. § 404.937, provides,

"The hearing examiner may, on his own motion, dismiss a hearing request, either entirely or as to any stated is-

---

1. Section 303(a) of Public Law 89–97, 79 Stat. 286 (the 1965 Social Security Amendments) amends the meaning of the term "disability" as found in 42 U.S. C.A. § 423 as follows: "(I)nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months * * *." Previously the physi-

cal or mental impairment had to " * * * be expected to result in death or to be of long-continued and indefinite duration."

Under the provisions of Section 303(f) of the law a period of disability may be established by use of this amended definition. However, benefits would only be payable beginning in September of 1965 or the seventh month in which an individual has been determined to be under a disability under the amended test, whichever is later.

sue, under any of the following circumstances:

"(a) *Res Judicata.* Where there has been a previous determination or decision by the Secretary with respect to the rights of the same party on the same issue or issues which has become final either by judicial affirmance or, without judicial consideration, upon the claimant's failure to request reconsideration, hearing, or review, or to commence a civil action with respect to such determination or decision."

The hearing examiner found that the two medical reports not considered in the prior application, both of which were made after the expiration of plaintiff's insured status, created no new issues and, consequently, insofar as the pre-1965 law is concerned, the 1962 decision was res judicata with respect to the 1966 application. This decision by the hearing examiner is correct and review of the record in the present case is limited to a consideration of the Act's post-1965 provisions to plaintiff's situation. Sowards v. Gardner, 264 F.Supp. 709 (S.D.W.Va. 1967).

Plaintiff was born on June 9, 1924 and has a fifth grade education. Most of his employment has involved what may be described as "heavy manual labor." His previous employment record includes jobs such as timbering and drilling in the coal mines, laying water pipes, operating a punch press, operating an electric press, and polishing and stacking steel. His earliest recorded injury was to his left ear, apparently as a result of a land mine explosion which occurred at Fort Lewis in 1945 while he was in the military service, and he has a total loss of hearing in his left ear. In 1954 plaintiff was injured while working for the Apex Electric Company, Cleveland, Ohio. This injury to his left side—causing a hernia—occurred as a result of his being struck by a box of washing machine gears which fell from a skidway while he was engaged in operating an electric press.[2] Subsequent to this accident, he was employed by the Perfection Stove Company as a lift truck driver; by Republic Steel Company where he polished and stacked steel;[3] by the Ford Motor Company as a lathe machine operator; by the James Lovell Company Foundry where his activities included the storing of steel and the placing of steel into the furnaces;[4] and by Clemons Buckeye Furnace as a shearer and punch press operator.[5]

■■ In the light of plaintiff's educational and employment background, it now becomes important to review the medical evidence presented at both the 1962 and the 1967 hearings. In reviewing this medical evidence, however, we are bound to keep in mind that any disability that had its onset or became disabling after the claimant last met the earnings requirements may not be used as the basis for a favorable finding. Taylor v. Ribicoff, 204 F.Supp. 144 (S. C.W.Va.1962). Thus, the medical reports submitted subsequent to the expiration of plaintiff's insured status will be treated only insofar as they shed light on his condition as it existed as of that time. The fact that he may now be disabled as a result of a deterioration of a then existing condition (gradual deterioration with age is a normal process common to all) or because of other ailments that were

---

2. Some confusion exists as to the exact date of this injury. Plaintiff indicated that the accident occurred sometime in 1954; however, Dr. Brown states that he first operated on plaintiff for a hernia in September of 1953.

3. It was while he was working for Republic Steel Company, according to plaintiff's testimony, that he "came to the hospital to be operated on." This operation was apparently for the repair of his hernia, although it is not so stated in the record.

4. It was while working at this foundry that plaintiff first "got trouble" with his back and was off from work for about two months.

5. Plaintiff testified that he worked at Buckeye Furnace until he was laid off; however, he also testified that he had been intending to leave the job anyway because he had "got busted loose" where he had been operated on for hernia.

not present as of June 30, 1958 is not pertinent to this decision.

Only two of the medical reports offered into evidence were concerned with medical findings made prior to the expiration of plaintiff's insured status in June of 1958. The first of these is that of Dr. James R. Brown, who examined plaintiff on December 5, 1955. This report—under the caption of "TO WHOM IT MAY CONCERN"—is rather limited. Dr. Brown found a small recurrent left inguinal hernia which he indicated plaintiff did not wish to have repaired. The doctor also reported that plaintiff complained of pain in his back leading up to his head, but he attributed this to the "wound" plaintiff received at Fort Lewis while in the military service.

The next medical report is from Dr. S. J. Ferguson, dated December 21, 1955, to the West Virginia Department of Public Assistance. On this date plaintiff's hearing was described as normal in the right ear, but he was found to be deaf in his left ear. His blood pressure was 130/75; pulse regular and full; heart size normal and heart sounds negative. The condition of the palpable arteries was found to be good and other pathology was negative. The doctor found no evidence of an abnormality or injury of a mental or nervous nature. The respiratory, digestive, and genito-urinary systems were all found to be negative. Some pain and limitation of motion in the neck and low back was reported. Dr. Ferguson also noted that plaintiff had a left inguinal hernia which, in his opinion, was operable. Diagnosis was that he suffered from a left inguinal hernia and cervical and sacral neuralgia.

On December 13, 1958, plaintiff was examined by Dr. Richard J. Stevens. This report states that his chief complaints were "myositis of the spine," headaches, pain in the back, deafness in the left ear, and a hernia. On physical examination, no evidence was found of a brain tumor. There was some limitation of motion in the back noted, but no other abnormality was disclosed. The heart and lungs were negative, as were the extremities. On examination, the blood proved to be normal and a rheumatoid arthritis test resulted in a negative finding. The doctor also found a small hernia present on his left side which, in the doctor's opinion, could be repaired. He felt that, owing to the new techniques in this area, plaintiff's hernia could be repaired with little likelihood of recurrence. Without this operation, however, plaintiff would be unable to engage in any gainful occupation.

In a medical examination performed for the Veterans Administration on May 16, 1961, by Dr. R. G. Arrington and Dr. Joseph Krimsky, plaintiff's heart was found not to be enlarged, regular in rate and rhythm, and with sounds of good quality. No murmurs were detected. Several small scattered areas of exfoliative dermatitis of the scalp and over the anterior surface of both tibiae with a slight scaling between the scabs of these areas were noted, but there was no evidence of infection. Examination of the nose, throat and sinuses proved negative. The external auditory canals and eardrums appeared normal and there were no perforations or scarring of either eardrum. The chest was clear to percussion and ausculation. An examination of the upper and lower extremities revealed a full range of motion of all the major joints. There was no swelling, deformity, or musculature atrophy present. Examination of the spine proved normal. The thyroid was not enlarged. With respect to the nervous system, the doctors could observe no tremor in his hands and his memory for past and recent events seemed to be normal; however, he had numerous complaints which were apparently of psychosomatic origin. A supplemental examination revealed total deafness in the left ear and a mild hearing impairment in the right ear. A small, direct, left inguinal hernia was noted, but the doctors did not state their opinions as to whether or not it was operable. Anxiety reaction was described as moderate. The lumbar spine showed no demonstrable abnormality.

The next medical examination was performed by Dr. Lawrence B. Gang on June 2, 1961. Plaintiff's chief complaints at this examination were "disabled back," perforated left eardrum, and a smothering condition when he was lying down, which he attributed to his back condition. He related a prior hernia operation, but informed Dr. Gang that the left inguinal hernia could not be repaired because of a post-operative complication at the time of his first operation, as a result of which he "almost died." After clinical examination, the doctor described plaintiff's heart as being "negative physically." An abdominal examination proved negative; X-ray of the chest disclosed a widened cardial shadow which was due to a prominent conus; and an electrocardiogram disclosed a wide QRS complex with short AV conduction time, a result which is characteristic of what is known as the Wolff-Parkinson-White syndrome. It was concluded from these tests that plaintiff had a congenital heart disease, and that as a result of the Wolff-Parkinson-White syndrome he would be subject to paroxysmal tachycardia, i. e., periods of excessive rapidity of the heart beat. The left inguinal hernia was also noted and the observation made that it would be disabling unless corrected. It was the doctor's opinion that there would be a certain amount of risk in surgery. This risk was accompanied by plaintiff's fear of surgery and his great anxiety and, in Dr. Gang's opinion, plaintiff would not permit such surgery to be performed.

Plaintiff was examined by Dr. James M. Whittico on September 20, 1962. This examination revealed a bilateral inguinal hernia, slightly enlarged heart and chronic pulmonitis. It was further found that plaintiff suffered from chronic gastroenteritis. Loss of hearing in the left ear was noted. It was the opinion of Dr. Whittico that as a result of these conditions, he was "unable to do any work."

Dr. John W. Ford examined plaintiff next on October 4, 1962. At this time his complaints were of pain in his back and legs, shortness of breath, pain in his chest and occasional nasal bleeding. As a result of his examination, Dr. Ford concluded that he had arthritis of the spine, neuritis of the chest, chronic sinusitis, and an enlarged heart. Plaintiff's condition was described as static. The left inguinal hernia was noted, but the doctor offered no opinion as to whether or not it was operable. Dr. Ford stated that he was unable to diagnose the heart and chest conditions and that they would have to be determined by X-ray and electrocardiogram.

The first of the two medical reports submitted by plaintiff during the October 1966 hearing was that of Dr. Arthur B. Richards. Dr. Richards' examination, dated June 17, 1964, indicated the presence of the Wolff-Parkinson-White syndrome. No opinion was given as to the severity or possible effects of this finding with respect to his overall condition. Also noted was a "rt. inguinal hernia." The location of this hernia was apparently a mistake on the doctor's part, since all other medical reports have indicated that the inguinal hernia was located on plaintiff's left side.

The second medical report submitted at the 1966 hearing and the one most favorable to plaintiff's case was prepared by Dr. David A. Perras as a result of tests conducted during the hospitalization of plaintiff from June 20, 1966 until June 24, 1966, at the Highlands Clinic, Williamson, West Virginia. He was admitted to the clinic for an evaluation with respect to "episodic tachycardia and chest pain" which he was then experiencing. Dr. Perras stated, "In general, the examination was unremarkable except for epigastric and mid dorsal tenderness." An electrocardiogram was reported as the low voltage type, otherwise it was "unremarkable." In another part of this report it is stated, however, that plaintiff does have a demonstrable electrocardiographic lesion of Wolff-Parkinson-White syndrome and suffers clinically from episodic tachycardia. The magnitude of these symptoms seem to be much greater than are usually noted in

other patients. Blood morphology was found to be normal and the urine and sputum culture were negative. Chest film was reported as within normal limits. RAI tests resulted in 44% and showed a borderline hyperthyroid range. X-ray of the dorsal spine revealed a slight compression fracture of the superior portion of the body of D7 with left lateral wedging. There was also a marked straightening of the lumbar lordotic curve due to muscle spasm. Skull film was normal. A gall bladder series resulted in a negative finding. The upper gastro-intestinal series of tests revealed hypertrophic rugal pattern which would be compatible with hypertrophic gastritis (chronic inflammation of the stomach wall). In his evaluation of the patient, Dr. Perras reported that plaintiff seemed to have an extraordinary fixation on his cardiac function. He is also reported to possess an anginal-like syndrome; however, the chest pain he experienced was, in the doctor's opinion, more likely related to a dorsal wall radiculitis, which was secondary to the traumatic wedged destruction of D7 with impingement on the nerve root. This pathology was demonstrated on the X-rays and, according to the medical report, relates back to an old work injury. Clinically, the patient had, to ausculation, a mild emphysema, not radiographically demonstrable, while the results obtained in the pulmonary function studies indicated severe respiratory embarrassment. Since the reliability of these studies depend on excellent cooperation and comprehension, Dr. Perras expressed the opinion that the results were probably not quite as pathologic as they might otherwise indicate. A bilateral hearing loss related to recurrent old middle ear disease was noted. The patient's cerebral function was designated as "borderline." Dr. Perras stated that the borderline hyperthyroidism and hypertrophic gastritis were potentially treatable. It was his opinion, however, that plaintiff was genuinely disabled as a result of the sum total of several disease processes rather than one single overriding element. He also expressed doubt as to whether any effort at rehabilitation would be fruitful, inasmuch as the cardiophobia previously mentioned is considerably ingrained.

Plaintiff has had the burden of coming forward with competent evidence from which it can be established that on or prior to June 30, 1958 he was unable, because of a medically determinable impairment, to engage in any substantial gainful activity and that this condition could be expected to last for a period of not less than 12 months. In the medical evidence, as presented at both the 1962 and the 1966 hearings, it seems apparent that there is substantial evidence to support a finding that neither on nor prior to June 30, 1958 was the plaintiff suffering from a medically determinable physical or mental impairment which had lasted or could be expected to last for a continuous period of not less than 12 months. In medical examinations conducted in 1958 and 1961, positive findings with respect to the condition of his heart were made. The conclusion reached as a result of these examinations was that the heart was not enlarged, that it was regular in rate and rhythm, and that it produced heart sounds of good quality with no murmurs. With respect to the condition of his spine, the opinions of the examining doctors were in some conflict. There was; however, substantial evidence from which the Secretary could find that the examination of the spine showed it to be normal. The Secretary is charged with resolving such conflicts that exist in the evidence, and it is immaterial for the purposes of this review that the evidence will permit a conclusion inconsistent with his, Thomas v. Celebrezze, supra, so long as the conclusion he did reach has substantial evidentiary support. Thus, the Secretary's findings of fact are conclusive if they are supported by substantial evidence. Underwood v. Ribicoff, supra. Moreover, in this instance we think the Secretary undoubtedly reached the correct conclusion.

The only impairment of such severity that could conceivably meet the

**808**

statutory requirements of the 1965 Amendment and which existed at the time plaintiff's insured status expired in 1958 is the left inguinal hernia. Prior to the 1965 Amendments, a remedial ailment could not be made the basis of a claim under the Act. Bradey v. Ribicoff, 298 F.2d 855 (4th Cir. 1962). This qualification with respect to the remedial nature of an impairment resulted in a denial of plaintiff's claim at the 1962 hearing since the hernia, although possibly disabling, was admittedly remedial. However, under the present definition of "disability," an impairment which has lasted or can be expected to last for a continuous period of not less than 12 months and which results in an inability to engage in any substantial gainful activity would qualify an applicant for a period of disability and disability payments under the Act. Williams v. Celebrezze, 353 F.2d 74 (4th Cir. 1965). Regarding the possible duration of his hernia impairment, it is significant that in 1958 Dr. Richard Stevens, after examining plaintiff, was of the opinion that with the new techniques this hernia could be repaired and that the likelihood of recurrence would be small. Under such circumstances, the period of disability would quite obviously have been less than 12 months. Although Dr. Gang, in his report, stated that there was a "certain amount of risk in surgery," this would certainly be true in practically all cases in which any surgery is required and in this respect the statement of Dr. Gang in no way contradicts the optimistic prognosis of Dr. Stevens. Thus plaintiff's principal and only potentially qualifying impairment was, at most, only temporarily disabling and fails to meet the statutory requirements of even the more liberal 1965 Amendment to the definition of "disability." The Secretary was, therefore, amply warranted in finding a lack of *substantial* evidence to support an award of benefits for the hernia condition.

When, as here, the plaintiff fails to sustain his initial burden—where he fails to establish an impairment which disables him within the meaning of the Act—it is unnecessary to consider the effect of his condition within the framework of his work history, education, and age, Bradey v. Ribicoff, supra, or for the Secretary to show the general availability of employment for which he is fit and qualified, as established in the cases of Ray v. Celebrezze, 340 F.2d 556 (4th Cir. 1965) and Williams v. Celebrezze, 359 F.2d 950 (4th Cir. 1966).

Accordingly, in view of the record as a whole, it is clear that a reasonable mind could very well have reached the same conclusion as did the Secretary—that the evidence failed to establish the claim asserted—and that being so, the defendant's motion for summary judgment must be granted.