**James D. KETCHER**

v.

**Kenneth S. APFEL, Commissioner of Social Security.**

**No. Civ.A. AW–98–3486.**

United States District Court,
D. Maryland.

Aug. 27, 1999.

---

Stephen F. Shea, of College Park, Maryland, for plaintiff.

Allen F. Loucks, Assistant United States Attorney, of Baltimore, Maryland, for defendant.

## MEMORANDUM OPINION

GAUVEY, United States Magistrate Judge.

The plaintiff, James D. Ketcher, filed this action seeking judicial review under 42 U.S.C. § 405(g) of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits ("DIB") under Title II and Part A of Title XVIII of the Social Security Act. Pursuant to 28 U.S.C. § 636(c) and Local Rule 301, the undersigned magistrate judge hears

this case by the consent of the parties. Pending before the Court are the parties' cross-motions for summary judgment. For the following reasons, the Commissioner's motion will be DENIED, the claimant's motion will be GRANTED, and the decision below will be REMANDED for further proceedings.

### Procedural Background

The claimant filed for DIB on February 10, 1995, alleging an inability to work due to degenerative disc disease, a herniated disc, and two back surgeries, which eventually made him stop working on September 23, 1994. (R. 48). The Social Security Administration (SSA) determined that the claimant's condition did not prevent him from working an denied him benefits on March 17, 1995. (R. 34). The claimant filed a request for reconsideration on March 22, 1995. (R. 62–65). The SSA determined, after considering further evaluations by its own examiners and independent physicians, that the claimant did not have a medical condition that prevented him from working. (R. 68). The claimant requested a hearing by an Administrative Law Judge ("ALJ") on August 7, 1995. (R. 41). He alleged that since the date he filed a request for reconsideration, he experienced increased pain, significant weight gain, scattered hypesthesia over his left leg, and a reduced capacity to walk, sit, and stand. (R. 46). The claimant had a hearing on August 14, 1996 in front of an ALJ, who found that, on January 23, 1997, the claimant not disabled. (R. 13–25). The claimant requested review on April 3, 1997, which was denied by the Appeals Council on August 18, 1998. (R. 4, 7). The ALJ's hearing decision is the final decision of the Commissioner and the instant case is before this Court for review.

See 42 U.S.C. § 405(g). The claimant filed the current civil action for review of the Commissioner's final decision on October 16, 1998. (Paper No. 1).

### Factual Background

The claimant was born on **November 11, 1958** and at the time of his hearing in front of the ALJ, he was 37 years old. (R. 81). He testified that he had a sixth grade education and no additional training or formal education.[1] (R. 83, 284). Testing indicated that the claimant has a seventh grade reading level, fourth grade spelling level, and a sixth grade arithmetic level. (R. 84). The claimant is currently married and lives with his spouse and a 14–year–old child. (R. 285–286). He also pays child support for his three other children. (R. 286).

Before his alleged disability, the claimant was a truck driver and mechanic for Rental Tools and Equipment, from September 16, 1992 until September 23, 1994.[2] (R. 57). His duties included loading, unloading, and delivering equipment, occasional operation of a forklift. (Id.). He also filled out log sheets, delivery sheets, and inspection sheets for trucks.[3] (Id.). He was required to lift and carry electrical cables 30 to 100 feet at a time, heaters, pipe dies, and jack hammers and hooked air compressors to trucks. (Id.). He frequently lifted 50 pounds and lifted up to 100 pounds. (Id.). On an average day, he usually spent two hours walking, one hour standing, and five hours sitting. (Id.).

After an injury sustained at work on **April 20, 1993,** the claimant went to see chiropractor Cathlyn Hartung on **April 23, 1993.** (R. 94). The claimant told Dr. Hartung "that on April 20 1993, he was hauling equipment and while pulling a cable to

---

1. However, he told a rehabilitation consultant that he was " 'pushed through the nine and tenth grade' and left school in 11th grade.", (R. 83).

2. This information was on a Vocational Report signed by the claimant. It appears that the claimant filled out this form himself. The claimant also reported that during the past 15

years, he worked as a mechanic, construction worker, truck driver, and working shop foreman.

3. At the hearing in front of the ALJ, the claimant stated that he did not fill out any log sheets. (R. 287).

load a loader onto a truck, he slipped backwards on a greasy floor and landed on his back and right side. He felt immediate pain in his 'lower back at that bottom of [his] spine.'" (*Id.*). The claimant complained of constant, severe, lower back pain with descending right leg pain, right ankle pain, and numbness and tingling in his foot. (*Id.*). He stated that his back pain began immediately after his fall and had gotten progressively worse in the past few days. (*Id.*). Dr. Hartung noted that the claimant was limping. (*Id.*). "Dermatermal sensitivity was tested and [was] found to be unequal between extremities for the L4 and L5 nerve route distributions." (R. 95). X-rays showed decreased disc spacing of the L5 and L6 regions. (*Id.*). Dr. Hartung concluded that the claimant's prognosis was fair and the claimant needed rest and possible surgery. (*Id.*). She recommended home rest, application of therapeutic packs, flexion distraction therapy, trigger point therapy, interferential muscle stimulation, and bracing. (*Id.*). She also noted that appropriate professional referrals would be made as needed. (*Id.*).

At the request of Dr. Hartung, Vimla Bhooshan, M.D., on **April 28, 1993,** performed an MRI of the claimant's lumbar spine, which showed significant narrowing at L5–S1 disc space, disc degeneration and narrowing at L4–L5 and L2–L3, degeneration without loss of height at L3–L4, subligamentous herniation of nuclear material and a fragment located on the right side producing compression of the right lateral aspect of the thecal sac and of the right L5 nerve root, and a small protrusion at the L3–L4 level touching the thecal sac. (R. 127–128).

On examination by orthopedic surgeon Lee Hieb, M.D., on **April 30, 1993,** the claimant described his back injury sustained on April 20, 1993: he slipped and struck a truck with his lower back while pulling a cable at work. (R. 77). At this visit, he complained of pain down his right leg and through his right buttock to his right heel, a tingling sensation on the lateral aspect of his right calf and right foot, and right leg weakness. (*Id.*). Dr. Hieb noted that the claimant was a "large gentleman" and that he walked with a limp and his pain increased with sneezing or coughing, sitting for any period of time, or standing for long periods of time. (*Id.*). She noted that the claimant's MRI scan showed "L5–S1 narrowing, disc degeneration at L4–5 with herniation of a disc fragment on the right at L4–5." (R. 78). X-rays taken at Dr. Hieb's office showed narrowing at the L5–S1, L3–L4, and L4–L5 disc space. (*Id.*). She diagnosed the claimant with a "[h]erniated nucleus pulposus[4] at L4–5, right more so than the left, which has been aggravated by his recent injury." (*Id.*). Dr. Hieb instructed the claimant to remain on bed rest for one week and off work for three weeks. (*Id.*).

The claimant's first visit in the record with neurosurgeon F. Donald Cooney, M.D., occurred on **May 10, 1993.** (R. 111). During this neurosurgical consultation, Dr. Cooney observed that the claimant's MRI scan demonstrated a herniated disc to the right with a free fragment at L4–L5. (*Id.*). Dr. Cooney advised the claimant to consider surgery. (*Id.*).

On **May 13, 1993,** the claimant underwent his first surgery: a laminectomy[5] and a diskectomy[6] in his lower back by Dr. Cooney at the L4–L5 region. (R. 70–71, 97). The claimant's preoperative diagnosis was a ruptured right L4–L5 disk (counting from the bottom) or L5–S1 (counting from the top). (*Id.*). Dr. Coo-

---

4. Semifluid mass of fine white and elastic fibers that form the central portion of an intervertebral disk. *Dorland's Illustrated Medical Dictionary,* 1159 (28th ed., W.B. Saunders Co.1994).

5. "[E]xcision of the posterior arch of a vertebra." *Dorland's Illustrated Medical Dictionary, supra* at 898.

6. "[E]xcision of an intervertebral disk." *Dorland's Illustrated Medical Dictionary, supra* at 492.

ney performed a foraminotomy [7] over the nerve root, exposing a ruptured fragmented disk posteriorly. (*Id.*). Then, the nerve root was retracted medially and the free fragment was removed. (*Id.*). A surgical pathology report by Usha Punja, M.D., on **May 14, 1993,** revealed that the fibrocartilage removed during surgery showed mucoid degeneration.[8] (R. 98).

The claimant next saw Dr. Cooney on **May 28, 1993,** two weeks after his surgery. (R. 110). Dr. Cooney noted that the claimant's incision was healing well and the claimant was walking, but straight-leg-raising was negative. (*Id.*). The claimant was given permission to return to work after Memorial Day, but was told to use a back support and to do exercises, such as swimming. (*Id.*).

On **June 7, 1993,** Dr. Cooney noted that the claimant had returned to work, was pulling motors from compressors, and was driving. (R. 109). The claimant complained of some increased low back pain, but stated that he did not have any leg pain. (*Id.*). Dr. Cooney opined that the claimant was "doing quite well" three weeks after surgery and recommended that he avoid heavy lifting. (*Id.*).

On **July 9, 1993,** the claimant saw Dr. Cooney and stated that he did not have any pain on that day. (R. 108). The claimant's examination showed negative straight-leg-raising bilaterally, no other changes, and that his weakness had not cleared. (*Id.*). Dr. Cooney opined that the claimant was doing well, but stated that he "still has limitation of his activities of this disc. He has periodic radicular

pain, limitation of motion with residuals of his foot drop." (*Id.*). Dr. Cooney reported that the claimant had reached his maximum improvement and that his residuals of 15% of his body were permanent.[9] (*Id.*).

The claimant first visited orthopedic surgeon Robert Smith, M.D., on **September 7, 1993** for a second opinion. (R. 154). Dr. Smith noted that the claimant had occasional mild spasm which cleared after treatment and diagnosed the claimant with residual back pain following a diskectomy. (R. 155). Dr. Smith agreed with Dr. Cooney's assessment of 15% impairment, however, Dr. Smith opined that the disability [10] may be greater. (R. 154). He recommended another MRI scan, back therapy, and a functional capacity examination and instructed the claimant to work on light duty status. (R. 155).

On **September 9, 1993,** Stanley Perl, M.D., performed an MRI of the claimant's lumbar spine which showed no recurrent herniation, a laminectomy defect at L4–L5 with epidural fibrosis,[11] and degeneration of all the lumbar disc spaces. (R. 126).

Dr. Hieb saw the claimant again on **September 24, 1993** at the request of his employer's workers' compensation insurer. (R. 79). Dr. Hieb recorded that the claimant had seen a neurosurgeon and had undergone surgery to remove a free fragment from the nerve root. (*Id.*). The claimant stated that his leg pain was gone since that time and he returned to work but was limited in that he could not bend for periods greater than 30 minutes or lift

7. An operation removing the roof of intervertebral foramina (natural opening or passage, especially through a bone) for the relief of nerve root compression. *Dorland's Illustrated Medical Dictionary, supra* at 648, 651.

8. "[D]egeneration accompanied by deposit of myelin and lecithin in the cells." *Dorland's Illustrated Medical Dictionary, supra* at 435.

9. These ratings are made according to the American Medical Association Guidelines, Fourth Edition.

10. Dr. Smith defined disability as the extent to which the impairment affects the claimant's ability to perform his job.

11. Formation of fibrous tissue upon or outside the dura mater (the outermost membrane covering the spinal chord). *Dorland's Illustrated Medical Dictionary, supra* at 512, 566, 628.

more than 30 pounds. (*Id.*). The claimant stated he had significant low back pain throughout the day and occasional pain that radiated into his posterior thighs at the level of his knees. (*Id.*). Dr. Hieb noted that the claimant appeared slender, had no evidence of a recurrent disc, and that his postoperative MRI scan, dated September 9, 1993, was consistent with an old L4–L5 laminotomy [12] and surgery. (R. 80). Dr. Hieb recommended no further therapy or surgery at this time, stating that the claimant should improve with time. (*Id.*). She noted that the claimant should remain active and that "[t]his may require certain compensation at work which he seems to be able to make on his own." (*Id.*).

On **October 12, 1993,** Dr. Smith opined that the claimant had reached his maximum medical improvement and that he had a 15% impairment directly related to his injury in April of 1993. (R. 156). Dr. Smith recommended home therapy and stated that the claimant was to remain on light duty status indefinitely. (*Id.*).

At the request of his employer, the claimant had an examination on **February 16, 1994** by orthopedic surgeon, Kevin Hanley, M.D. (R. 70–72). Dr. Hanley noted that the claimant recently began to have trouble in his left leg with numbness on the bottom of his left foot and also some pain in his left buttocks. (R. 71). He reported that the claimant had "some restriction of motion" and could flex about 40 degrees before experiencing pain. (*Id.*). At the time of this examination, the claimant was still working, but was on a modified duty position, which required less lifting. (*Id.*). Dr. Hanley diagnosed him with residual herniated nucleus pulposus, suggested a reevaluation in May 1994, and recommended observation at the present time with no additional treatment or therapy. (R. 72). Dr. Hanley noted that the claimant received care from Dr. Robert

Smith, who was referred to the claimant by his attorney, even though the claimant had "adequate orthopedic management available to him much closer" to his residence. (R. 71–72). He also noted that although the claimant had been released from Dr. Cooney's care, he should continue to be evaluated by Dr. Cooney, and not by Dr. Smith, "who is not an operating back surgeon and obviously cannot render the definitive treatment that [the claimant] may need." (*Id.*).

On **March 8, 1994,** Dr. Smith stated that there was evidence that the claimant had epidural fibrosis, which may account for some radicular pain. (R. 150). He stated that x-rays taken of the claimant's lumbosacral spine showed a subtle segmental instability at L4–L5 where he had his diskectomy. (*Id.*). He opined that this may be the source of the claimant's back pain. (*Id.*). Dr. Smith told the claimant that a fusion could theoretically get rid of his back pain, but he recommended the alternative of wearing a corset as long as it made his pain better. (*Id.*). He recommended staying on light duty status at work indefinitely due to his back problem. (*Id.*).

The claimant visited Dr. Cooney on **March 18, 1994,** in which he stated that his condition had worsened. (R. 107). Dr. Cooney's examination revealed negative straight-leg-raising and pain in the lower back and left buttock. (*Id.*). Dr. Cooney recommended follow-up studies. (*Id.*).

On **March 21, 1994,** Dr. Smith opined that the claimant had a 20% impairment rating directly related to his injury in April of 1993 because of his disc lesion, segmental instability, epidural fibrosis, loss of function and endurance, and recurrent episodes of pain. (R. 151).

On **March 23, 1994,** Dr. Perl, after performing an MRI of the claimant's lumbar spine, found degenerative disc change at

12. The "division of the lamina of a vertebra." *Dorland's Illustrated Medical Dictionary, su-* *pra* at 898.

L4–L5, L3–L4, and L2–L3. (R. 124–125). He found no evidence of recurrent or residual disc herniation, mild epidural fibrosis surrounding the right L5 nerve root, that the left L4 nerve root may be minimally displaced posteriorly, and no evidence of spinal stenosis or significant neural foramen narrowing. (*Id.*).

Dr. Cooney reported, on **March 28, 1994,** that the claimant's MRI scan showed no recurrence of the disc. (R. 106). He noted that the claimant had irritation in his back while driving and that he had gained weight. (*Id.*). He recommended that the claimant use a lumbosacral corset and that an x-ray be taken. (*Id.*). On **March 29, 1994,** a report by Paul Lobar, M.D., showed degenerative changes at L5–S1 and S1–S2 and considerable limitations in flexion.[13] (R. 96).

On **April 11, 1994,** Dr. Cooney observed that the claimant had no changes in flexion, limited extension of the lumbar spine, and continued to have residuals from his disc. (R. 105). He advised the claimant to continue his exercises. (*Id.*).

On **June 6, 1994,** Dr. Cooney reported that the claimant had returned to work as a driver on light duty. (R. 104). He noted that the claimant had negative straight-leg-raising, limitation of full flexion of the lumbar spine, tenderness in the paraspinal muscles, a slight lumbar scoliosis,[14] and scattered hypesthesia[15] over his right leg. (*Id.*). Dr. Cooney concluded that the claimant had a permanent partial disability rating of 25% of the body as a whole. (*Id.*).

On **August 22, 1994,** Dr. Smith noted that the claimant had back pain that radiated into his left buttock and thigh. (R. 148). He recommended the claimant receive epidural injections and told him to try to continue working on light duty status. (*Id.*). He noted, however, that the claimant said that his employer was not too sympathetic about him working on light duty status. (*Id.*).

Dr. Hanley evaluated the claimant again, at the request of his employer, on **September 7, 1994,** to determine if he had an impairment and if he was maximally medically improved. (R. 73–74). He noted that the claimant could not sit without discomfort and feeling numbness in his left leg. (R. 73). Standing for long periods of time also caused him difficulty in his left leg. (R. 73–74). After reviewing a MRI scan and x-rays, Dr. Hanley diagnosed the claimant with a narrow degenerative disc at L5–S1 and degenerative disc disease. (R. 75). Dr. Hanley opined that the claimant would not substantially change with additional treatment and that he was at maximum medical improvement and he concluded that the claimant had an impairment rating of 25%.[16] (*Id.*). Dr. Hanley noted that the claimant had lost considerable amount of function and could not perform strenuous work activities. (*Id.*). He did not recommend surgery at that time, but noted that if relief with epidural steroids was not effective, he could consider a lumbar interbody fusion. (*Id.*).

On **September 12, 1994,** Dr. Smith reported that the claimant continued to have back pain that radiated into his left thigh and buttock. (R. 147). He recommended trying epidural injections and remaining on light duty status at work. (*Id.*). Dr.

---

13. The record is not clear regarding Dr. Lobar's status. It appears, however, that he is a radiologist and that this record is an evaluation of an x-ray of the claimant's back.

14. A "lateral deviation in the normally straight vertical line of the spine." *Dorland's Illustrated Medical Dictionary, supra* at 1497.

15. Also referred to as hypoesthesia, "a dysesthesia [distortion of any sense] consisting of abnormally decreased sensitivity, particularly to touch." *Dorland's Illustrated Medical Dictionary, supra* at 515, 803, 806.

16. "[A]ccording to the AMA Guide To The Evaluation Of Permanent Impairment, Fourth Edition, which takes into consideration his motion loss as well as his operative condition of 20%...." (R. 75).

Smith rated the claimant as 20% impaired. (*Id.*).

On **September 21, 1994,** Phyllis Barson, M.D., began to administer a series of epidural blocks which consisted of Duranest,[17] Depo–Medrol,[18] and fentanyl.[19] (R. 112). The second block was administered on **September 23, 1994,** with no improvements noted from the first block of injections. (R. 116).

Dr. Smith reported, on **September 27, 1994,** that the claimant was not doing well symptomatically: he continued to have back pain and buckling in his leg. (R. 146). He noted that the claimant's epidural injections did not have very good results. (*Id.*). Dr. Smith suggested the claimant have a myelogram[20] to learn if there was a possible hidden disc. (*Id.*). Dr. Smith also noted that the claimant was not capable of working. (*Id.*).

On **September 30, 1994,** Dr. Cooney reported that the claimant had been seen by Dr. Smith and had been off work. (R. 103). The claimant still had restricted straight-leg-raising and Dr. Cooney recommended a follow-up MRI scan. (*Id.*). The claimant was placed on anti-inflammatory medication. (*Id.*).

On **October 3, 1994,** an MRI of the claimant's lumbar spine showed no significant changes from the last study done on March 23, 1994. (R. 122). A degeneration of all the lumbar disc spaces and "foraminal stenosis bilaterally at L4–5 more prominent on the right than the left secondary to loss of height of disc space" was noted. (*Id.*).

During his examination on **October 6, 1994,** Dr. Cooney reviewed the claimant's MRI scan and stated that it showed no evidence of recurrent disc, a slight bulge at

the L4–L5 disc, and that the site of the claimant's previous surgery was normal. (R. 163). Dr. Cooney advised the claimant to continue his exercises and anti-inflammatory medication, and told him to not to do any heavy work over the next three weeks. (*Id.*). In a letter dated **October 6, 1994,** Dr. Cooney stated that the claimant was to remain off work until further evaluation. (R. 102).

On **November 2, 1994,** the claimant told Dr. Cooney that he was increasing his activities and scheduled a meeting with a vocational rehabilitationist. (R. 101). On examination, the claimant had tightness in his lumbar region and hypesthesia over his left foot, but could flex his lumbar spine up to 80 degrees. (*Id.*). Dr. Cooney noted that the claimant remained temporarily disabled. (*Id.*). In a letter dated *November 2, 1994,* Dr. Cooney stated that the claimant "is to remain off work until his condition is reevaluated in approximately 8 weeks." (R. 100).

On **November 7, 1994,** the claimant was seen by Trudy Koslow, a rehabilitation consultant, at the office of the claimant's attorney. (R. 83). On **December 12, 1994,** Ms. Koslow reported that the claimant was interested in returning to a suitable employment given his restrictions. (R. 82). She obtained a Physical Capacities Evaluation from his treating physician, Dr. Cooney, dated **November 10, 1994,** which stated that the claimant could sit, stand, walk, and drive for one hour; could lift or carry up to 10 pounds frequently, up to 20 pounds occasionally, but could not carry over 21 pounds; and could bend, stoop, squat, and crawl occasionally. (*Id.*). Ms. Koslow verified from Dr. Cooney on **December 9, 1994** that the claimant could "work on a full time basis if he is able to

17. Etidocaine hydrochloride, a local anesthetic. *Dorland's Illustrated Medical Dictionary, supra* at 512, 584.

18. Methylprednisolone acetate, used as an anti-inflammatory or for adrenal insufficiency. *Dorland's Illustrated Medical Dictionary, supra* at 445, 1032.

19. A narcotic analgesic. *Dorland's Illustrated Medical Dictionary, supra* at 616.

20. A radiograph of the spinal chord. *Dorland's Illustrated Medical Dictionary, supra* at 1089.

change positions at least every hour during an eight hour work period." (*Id.*). Taking into consideration the claimant's medical problems, education, and work history, Ms. Koslow began to consider possible employment opportunities for the claimant and met with him on **December 14, 1994** to discuss these employment positions. (R. 85, 89). The claimant was given a list of the following potential jobs to review: automotive counter parts person, animal shelter attendant, cashier, emission inspector, loss prevention associate, inserter operator, police services coordinator, and security guard. (R. 90).

On **December 29, 1994**, the claimant told Dr. Cooney that his medications, including Prednisone, did not decrease his discomfort. (R. 162). Dr. Cooney noted limited motion of the lumbar spine and restricted straight-leg-raising bilaterally. (*Id.*). He recommended a complete evaluation with a myelogram and a CT scan. (*Id.*).

On **December 30, 1994**, an MRI of the claimant's lumbar spine showed that L5–S1 was congenitally narrowed but indicated degeneration, which was unchanged since October 3, 1994. (R. 120). A recurrent herniation of nuclear material on the right at L4–L5 that was not apparent on October 3, 1994 and degeneration of all the lumbar disc spaces was noted except at L3–L4. (*Id.*).

Ms. Koslow reported on **December 31, 1994,** that the claimant's attorney contacted her and reported that the claimant was unable to participate in vocational rehabilitation because he was having additional medical testing and may have further surgery. (R. 90). However, Ms. Koslow noted that the claimant was made aware of the types of jobs she would seek for him. (*Id.*). Ms. Koslow noted that as of December 31, 1994, the claimant was not involved in a search for employment and was wait-

ing for a medical opinion as to whether or not he should search for work. (R. 91).

On **January 12, 1995,** Dr. Cooney stated that the claimant's repeat MRI scan showed a recurrence of the disc at L4–L5 on the right, which was not present there in his previous two scans. (R. 161). He suggested considering surgery of this fragment recurrence. (*Id.*). Examination showed a positive straight-leg-raising to the right. (*Id.*). Dr. Cooney noted that since the claimant was young, possibility of a spinal fusion should be considered "if the facet on the right side [were] further affected by repeat surgery." (*Id.*).

Ms. Koslow reported, on **January 13, 1995,** that the claimant would be undergoing surgery within a week and therefore his file for vocational rehabilitation was closed at that time. (R. 93).

On **January 17, 1995,** the claimant underwent his second surgery by Dr. Cooney, which consisted of a right hemilaminectomy,[21] foraminotomy,[22] and removal of a ruptured disk fragment. (R. 157). Both postoperative and preoperative diagnoses were ruptured disk at right L4–L5. (*Id.*). A surgical pathology report dated **January 19, 1995,** signed by Dr. Punja, found that the fibrocartilage from surgery showed mucoid degeneration. (R. 135).

A few weeks after his second surgery, Dr. Cooney noted, on **February 9, 1995,** that the claimant still had periodic pain about his thigh. (R. 160). He told the claimant to increase his walking and stated that he remained temporarily totally disabled. (*Id.*).

On **February 13, 1995,** a SSA interviewer had a personal interview with the claimant and observed that he had difficulty sitting because he occasionally shifted in his chair. (R. 55).

On **February 14, 1995,** Dr. Smith noted that the claimant complained of back pain

---

**21.** A surgical removal of one side of the vertebral lamina. *Dorland's Illustrated Medical Dictionary, supra* at 745.

**22.** Removal of the roof of intervertebral foramina for the relief of nerve root compression. *Dorland's Illustrated Medical Dictionary, supra* at 651.

and numbness in his right lower extremity. (R. 144). He reported that the claimant had some residual spasm in his lumbar spine but no "gross motor weakness." (*Id.*).

On **March 10, 1995,** Dr. Udvarhelyi completed a Residual Physical Function Capacity Assessment on the claimant based on his medical records. (R. 167–173). He found that the claimant's exertional limitations were as follows: he could occasionally lift/carry up to 20 pounds and frequently up to ten pounds, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and had unlimited pushing and pulling capacity. (R. 168). The claimant's postural limitations were as follows: he could occasionally climb, stoop, kneel, crouch, and crawl and could frequently balance. (R. 169). He had no manipulative, visual, communicative, or environmental limitations. (R. 170–171). Dr. Udvarhelyi noted that there were no treating or examining source statements regarding the claimant's physical capacities in the files that he examined. (R. 172). Dr. Udvarhelyi's final recommendation was that the claimant had a residual functional capacity to lift up to 50 pounds and carry up to 25 pounds. (R. 166).[23]

Dr. Cooney, on **March 22, 1995,** noted that the claimant had been increasing his activities and walking, but he had gained weight and weighed 259 pounds at this visit. (R. 131). He reported that the claimant had "limitation of flexion of the lumbar spine." (*Id.*). Dr. Cooney recommended the claimant increase his exercises

and try to reduce his weight. (*Id.*). He stated that the claimant remained temporarily totally disabled. (*Id.*).

On **March 27, 1995,** Dr. Smith opined that the claimant's disability was "at the present time ... of an indefinite duration that will prevent him from engaging in any substantial gainful employment." (R. 143). He noted that the claimant was still seeing Dr. Cooney and required "additional rehabilitation before he will be able to reach maximum medical benefit." (*Id.*).

On **May 4, 1995,** the claimant complained of increased pain to Dr. Cooney. (R. 132). He continued to have significant weight gain and weighed 258 pounds. (*Id.*). Dr. Cooney reported that the claimant had restricted flexion of the lumbar spine and scattered hypesthesia over the left leg. (*Id.*). He advised the claimant to exercise more regularly and try to reduce his weight. (*Id.*).

On **May 26, 1995,** Alan Schreiber, M.D., and orthopedic surgeon, examined the claimant and found that the claimant had some deceased range of motion of his lumbar spine. (R. 164). Dr. Schreiber opined that he did not think that the claimant had "any work hardening program or any other type of aggressive rehabilitation following the second surgery." (*Id.*). He also did not think that the claimant had reached maximum medical improvement at that point. (R. 165). He stated that the claimant could not return to his old job because his job required heavy lifting. (*Id.*). However, he opined that the claimant could probably perform sedentary[24] or

---

**23.** A Disability Determination and Transmittal form, dated **March 13, 1995,** stated that the claimant had "hemibminectomy" [sic] and degenerative disc disease and found the claimant not disabled. (R. 69). The form was signed by Dr. Udvarhelyi and a SSA disability examiner, whose name was not legible. (*Id.*).

On *May 22, 1995,* another Disability Determination and Transmittal form stated that the claimant had lumbar disc disease and affirmed the original determination made on March 13, 1995 that the claimant was not

disabled. (R. 68). The form was signed by Henri Voorstad, M.D., and a SSA disability examiner, whose name was not legible. (*Id.*).

**24.** "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

light duty work that required no prolonged sitting or standing, no lifting over ten pounds, and no repetitive bending, stooping, or lifting. (*Id.*). Dr. Schrieber felt that it was too early to do a permanency rating on the claimant because he was only four months post-op. (*Id.*). He also recommended the claimant participate in physical rehabilitation and work hardening programs. (*Id.*).

On his **June 21, 1995** visit with Dr. Cooney, the claimant stated that he was exercising regularly. (R. 133). He weighed 258 pounds, six pounds less than that of his last visit.[25] (*Id.*). On physical examination, Dr. Cooney reported that the claimant could straight-leg-raise to 90 degrees in a sitting position and has a well-healed lumbar incision. (*Id.*). The claimant told Dr. Cooney that he was offered a job chucking clams for $4.00 an hour, but that this income was too little to handle his financial obligations. (*Id.*). Dr. Cooney noted that the claimant remained temporarily totally disabled. (*Id.*).

On **January 4, 1996,** the claimant told Dr. Cooney that he did some considerable walking during a vacation in Hawaii in December of 1995, but had experienced some back pain. (R. 184). On examination, Dr. Cooney reported that the claimant's straight-leg-raising was negative bilaterally, he had scattered areas of hypesthesia on the left foot, and he had limited flexion of the lumbar spine. (*Id.*). He opined that the claimant's residuals of his ruptured disc were permanent and may required further surgery if he had signs of irritation on motion. (*Id.*). He further rated the claimant's disability—which was permanent and partial to the body as a whole—as 25% impaired. (*Id.*).

On **January 15, 1996,** the claimant's file for vocational rehabilitation was reopened (R. 200), but a progress report dated **January 29, 1996** reported that the claimant's attorney informed the consultants' office that Dr. Cooney stated that the claimant

could not participate in vocational rehabilitation at that time. (R. 199).

At the request of the rehabilitation consultant, Dr. Cooney filled out a Physical Capacities Evaluation, dated **February 21, 1996,** on the claimant. (R. 195–196). He reported that the claimant could sit for one hour in an eight-hour workday, lift 11 to 20 pounds occasionally, carry 11 to 20 pounds occasionally, could use his hands to grasp items and for fine manipulation, but could not use his hands or feet to push or pull. (R. 195). The claimant could not bend, squat, crawl, climb, or reach. (R. 196). The claimant was not able to function near unprotected heights or around moving machinery; could not be exposed to marked changes in humidity and temperature, dust, fumes, or gases; and could not drive automotive equipment. (*Id.*). Furthermore, Dr. Cooney stated, in this evaluation, that the claimant remained disabled. (*Id.*).

On **February 22, 1996,** the claimant complained to Dr. Cooney of back pain and radicular discomfort and mentioned that he was interested in obtaining social security benefits. (R. 183). An examination revealed restricted flexion of the lumbar spine. (*Id.*). Dr. Cooney advised the claimant to continue his exercise program and noted no need for surgical intervention. (*Id.*).

On **February 29, 1996,** the rehabilitation consultant noted that Dr. Cooney indicated on **February 15, 1996,** in a telephone conversation, that the claimant was 25% disabled. (R. 192). Ms. Lehowicz reported that the Physical Capacities Evaluation form filled out by Dr. Cooney did not give clearly defined restrictions and therefore vocational rehabilitation services could not be provided for the claimant. (*Id.*).

On **March 21, 1996,** Dr. Cooney noted that the claimant had no changes from his previous visit. (R. 182). The claimant had seen Dr. Hanley, who brought up the possibility of a fusion; Dr. Cooney, however,

---

25. The last visit being referred to is not in the record.

felt that the claimant was too young to have a fusion and saw no evidence of instability. (*Id.*). Dr. Cooney suggested the claimant get other opinions and, if he deemed necessary, to go ahead with the fusion since some patients with chronic lumbar pain after diskectomy have found a fusion helpful. (*Id.*).

The claimant visited orthopedic surgeon Philip Schneider, M.D., on **April 16, 1996** for information on a lumbar fusion. (R. 189–190). Dr. Schneider noted that the claimant had a very narrowed disc space at L4–L5 and opined that the pain was emanating from this location. (R. 189). He noted "no significant spasm" and "a reduced range of motion in the lumbar spine." (*Id.*). He discussed with the claimant the risks and complications with lumbar fusion and also discussed alternative treatments. (R. 189–190). The claimant was interested in proceeding with the surgery, and was to get back with Dr. Schneider about his decision. (R. 190).

On **May 10, 1996,** an MRI of the claimant's lumbar spine at the request of Dr. Schneider was done showing a small residual/recurrent right paracentral disc protrusion at L4–L5 that was in contact with, but probably not displacing, the right L5 nerve root. (R. 187–188). He noted that it was smaller than in the last exam. (*Id.*). He also reported "small disc bulges at L1–2, L2–3, and L3–4 which [did] not significantly compromise adjacent neural structures." (*Id.*).

The claimant's third surgery occurred on **June 19, 1996** in which Dr. Schneider performed a lumbar laminectomy and a posterior spinal fusion. (R. 215). The claimant was discharged from the hospital on **June 22, 1996** in a "state of improved condition" and was told to wear a brace full time. (R. 217). His discharge diagnoses were spinal stenosis and lumbar instability. (*Id.*).

On **July 25, 1996,** claimant told Dr. Schneider that he recently fell in his backyard and since then, had pain in the left buttock area of his left leg to the foot. (R. 186). Dr. Schneider noted that the claimant was not wearing his back brace at the time of the fall. (*Id.*). The claimant stated that prior to the fall, he was not experiencing this type of pain and was doing quite well. (*Id.*). An x-ray of the lumbar spine showed a satisfactory alignment. (*Id.*). The claimant stated that his brace was uncomfortable and he had been removing it. (*Id.*). Dr. Schneider advised the claimant to wear his brace at all times, avoid all physical activity, rest, and return in four weeks. (*Id.*).

During a follow-up visit with Dr. Schneider on **October 29, 1996,**[26] Dr. Schneider reported that the claimant's back pain had improved and x-rays showed the pine in good position. (R. 278). He also indicated that his fall in July of 1996 did not cause any increase in back pain. (*Id.*). Dr. Schneider recommended that the claimant begin to wean himself off of his brace and use a treadmill for exercise. (*Id.*). He indicated that the claimant could not return to his former employment and would be better suited in a light duty position (*Id.*).

On **December 30, 1996,** Dr. Schneider reported that the claimant was at maximum medical improvement, except that he could choose to remove the battery from his bone growth simulator if he wished. (*Id.*). The claimant stated that he was doing better and had no significant pain, as he did previously. (*Id.*). He had no leg pain, other than some spasm in his left thigh several days prior. (*Id.*). Dr. Schneider stated that the claimant could not return to his previous work, but could do light duty work. (R. 279). He told Linda Dugan, the claimant's nurse rehabilitation consultant that had accompanied the claimant to this doctor's visit, that the

---

**26.** This visit occurred after the hearing in front of the ALJ, which took place on August 14, 1996.

claimant was capable of the following jobs: driving a wheelchair van, pushing wheelchairs, and a parts counter job. (R. 278–279). Dr. Schneider further stated that the claimant was restricted from lifting more than 20 pounds and needed to be able to sit and stand during a workday. (R. 279). Dr. Schneider recommended that the claimant first work on a part time status and gradually work his way back to full time. (*Id.*).

### Testimonial Evidence

The hearing in front of the ALJ took place on **August 14, 1996** in which the claimant and a vocational expert (VE) testified. (R. 280–313). The claimant testified that he did not complete the seventh grade and could not read or write, but he could read some street signs. (R. 285–286). The claimant stated that he worked as a truck driver and mechanic at a rental tools and equipment company until September 24, 1994, after his second surgery. (R. 286). The claimant also stated that he was not required to maintain a log, as long as he worked eight hours a day and that he did not have any other record keeping functions. (R. 287). All of the claimant's work from 1981 to 1990 involved automotive mechanical work. (R. 288–289). He testified that he took three or four Percocet on a good day and would go up to the limit for more pain and that he took Tylenol 3 twice a day for slight pain. (R. 289). The claimant testified that he would drive 200 miles round trip once a month in order to visit his doctors and that it took almost two hours to reach his doctor's office. (R. 290). In order to make these trips, the claimant would drive one-third of the way and then his father-in-law would drive the rest. (R. 291). The claimant testified that he could lift and carry up to four pounds for short distances, made four trips up and down stairs a day, could walk up to 200 yards before resting, could sit up to 45 minutes, and could stand a little longer than 45 minutes. (R. 291–292). He stated that he could do a little cooking, wash dishes, and dust. (R. 292). The claimant

stated that he receives $362 a week from Workmen's Compensation. (R. 294). The claimant had been wearing a brace since his last surgery to hold him straight, but he claimed to still have pain. (*Id.*). Between 1994 and July of 1996, the claimant wore a corset brace, but he was still in pain. (R. 294–295). The claimant testified that when his wife won a trip to Hawaii, they were there for nine days, in which he did not do much walking and many times used a wheelchair. (R. 295–296).

When the claimant's attorney examined him, the claimant reported that he required assistance getting dressed, putting on socks and shoes, and had difficulty sleeping, even after his latest surgery. (R. 296). He stated that could not bend, and that he removes his brace because it cuts him and bruises his ribs. (R. 297). After the claimant drives for long distances, to his doctor's, for example, his legs feel like "sponge rubber" and he is unstable. (*Id.*). The claimant told the court that he sometimes loses feeling in his legs which can last up to five minutes. (R. 298). He was able to pass a driving test because his wife would read the testing material out loud to him until he understood. (*Id.*). Then he took the test by recognizing some words, but he stated that he passed by "luck." (R. 299). The claimant testified that he had 40 hours of vo–tech training in automatic transmissions. (R. 300). He stated that when he went on light duty work at his former employment, his employer insisted that he lift up to 40 pounds, which was more than the weight suggested by his doctor (R. 301). He eventually stopped working in September of 1994 and returned to work for about a month after his second surgery, which was in January of 1995. (*Id.*). From that time, until the hearing, the claimant did not work. (R. 302).

After the claimant's testimony, Dr. James Ryan testified as a vocational expert. (R. 302–312). The VE classified the claimant's past work at a medium to heavy exertional level and semiskilled. (R. 303–

304). He also opined that the skills associated with the claimant's occupations were occupationally specific and not readily transferrable. (R. 304). The ALJ then posed the following hypothetical to the VE:

Assume, if you would, please, an individual ... who's 37 years of age, has six years of education, and the past work experience as a truck driver and mechanic in the automotive industry, automotive and heavy equipment industry. Assume that this individual is limited to lifting and carrying—and by the way I'm—for this utilizing parts of Exhibit 21, page 2, and also Exhibit 28, and it's the 21—2/21/96 evaluation of Dr. Koony [sic]. Assume the individual can lift and carry up to ten pounds occasionally. The individual can sit no more than one to two out of eight hours. That the individual should avoid any bending. Further that the individual should avoid frequent or prolonged stooping, kneeling, or crouching. Assume further that in keeping with Exhibit 13 that such an individual can read at the seventh grade level, can spell at the fourth grade level, and can do simple math. Assume further that because of pain, residuals of pain and also medication that such an individual would be limited to a low stress work environment performing

non-quota production work. Are there jobs that such an individual could perform which exists in significant numbers in the local and national economies?

(R. 304–305). The ALJ also added, after a clarification by the VE, that the individual could sit from one to two hours in an eight-hour day and "should be able to stand and break the standing with sitting occasionally." (R. 305). The VE answered that, based on this hypothetical, there would be sedentary, unskilled occupations within the individual's residual functional capacity such as a cashier, quality control worker, and general office clerk. (*Id.*). The VE stated that in the national economy, there are 25,000 positions for cashiers, 22,000 for a quality control workers, and 46,000 for a general office clerks. (*Id.*). The VE further stated that in the local economy, there are 1,100 positions for cashiers, 1,600 for a quality control workers, and 2,100 for a general office clerks. (*Id.*). The VE noted that these possible jobs were examples only and the list was not exhaustive. (R. 306).[27]

### The ALJ's Findings

Following the hearing, the ALJ, in a written opinion, denied the claimant's application for DIB. At the first step of the required analysis,[28] the ALJ found that the

---

27. The claimant's counsel, Ms. Digiovanni, then questioned the VE concerning the requirements of the jobs he offered as examples of sedentary work for the claimant. (R. 306–309). Counsel also asked the VE if reading or stooping for filing would be required for an office clerk position. (R. 306). The VE responded that the claimant would only need to know the alphabet and that no frequent or prolonged stooping would be required. (*Id.*). Counsel then asked if reading would be required for a quality control inspector and the VE responded that the position he referred to was for a visual inspector. (R. 307). Counsel asked if a cashier position would allow the claimant to sit during the workday and the VE testified that there would be sufficient space for the cashier to sit. (R. 308–309). Counsel further asked the VE whether he knew of the availability of jobs within a 30–mile radius of the claimant's home and the VE answered that he did not. (R. 311). With this line of questioning, the ALJ clarified that

"this is a national program based on national figures ... [and] national numbers have been given and are reasonably significant" and that what jobs are in the local vicinity of the claimant's residence is not an issue in this case. (R. 311–312).

28. In step one, the ALJ determines whether the claimant has engaged in "substantial gainful activity." If not, then the ALJ proceeds to step two in order to determine whether the claimant has a medically severe impairment or a combination of impairments. If so, the ALJ continues to step three and determines whether the severe impairment is equivalent to one listed in on the Listing of Impairments, which, if listed, the ALJ finds the claimant disabled. If it is not listed, nor is equal to one that is, the ALJ applies the fourth step and determines whether the impairment prevents the claimant from performing her past relevant work. If it does, the ALJ

643

claimant had not engaged in substantial gainful activity since September 23, 1994. (R. 17). The ALJ stated that "[t]he record reflects that [the claimant] has lumbar disc disease, status post back surgery, with residual herniated nucleus pulposus (Exhibit 11)." (*Id.*). Therefore, the ALJ concluded that the claimant has a severe impairment that satisfied step two. (*Id.*). However, at the third step, the ALJ found that the claimant did not have an impairment that met the criteria of any of the Listing of Impairments described in 20 C.F.R. § 404, Subpt. P, App. 1. (*Id.*).

After a review of the relevant medical evidence, the ALJ concluded that the claimant retained the residual functional capacity[29] to perform sedentary work or work which requires lifting and carrying no more than ten pounds occasionally. (R. 18–21). The ALJ also found the claimant's allegation of constant, severe, debilitating pain not fully credible because it was inconsistent with the evidence in the record. (R. 21).

At step four, the ALJ found that the claimant lacked the residual functional capacity to return to his past relevant work because it required the claimant to lift heavy objects or stand and walk for prolonged periods of time. (*Id.*).

The ALJ noted that according to the claimant's age, work experience, and education, if he were able to perform a full range of sedentary work, Medical–Vocational Rule 201.25 ("grids") would find the claimant not disabled. (R. 22). However, the ALJ stated that the claimant had significant non-exertional impairments which would preclude the use of the grids. (*Id.*). Therefore, the ALJ relied on the testimony of the VE, who stated that given the claimant's impairments, he could perform sedentary work which existed in significant

numbers in the national and regional economies. (*Id.*).

Thus, at step five, given that the claimant could perform a significant number of jobs in the regional and national economies, the ALJ found the claimant not disabled.

### Standard of Review

The function of this Court is not to review the plaintiff's claim *de novo*, but to leave the findings of fact to the Commissioner. This Court must determine whether, upon the whole record, substantial evidence supports the Commissioner's decision. *See King v. Califano*, 599 F.2d 597 (4th Cir.1979); *Teague v. Califano*, 560 F.2d 615 (4th Cir.1977), *rev'd on other grounds, Hyatt v. Heckler*, 807 F.2d 376 (4th Cir.1986). Substantial evidence is more than a scintilla, but less than a preponderance of the evidence presented. *See Laws v. Celebrezze*, 368 F.2d 640 (4th Cir.1966). It is such evidence as a reasonable mind might accept as adequate to support a conclusion and must be sufficient to refuse a directed verdict were the case before a jury. *See Teague*, 560 F.2d at 618.

If substantial evidence supports the decision of the Commissioner, then that decision must be upheld. *See Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Jolley v. Weinberger*, 537 F.2d 1179 (4th Cir.1976); *Blalock v. Richardson*, 483 F.2d 773 (4th Cir.1972); 42 U.S.C. § 405(g). In reviewing for substantial evidence, the court does not weigh the conflicting evidence, make credibility determinations, or substitute its judgement for that of the Commissioner. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Notwithstanding the deference that this Court must show to the Commissioner's finding of fact, "a factual finding

must determine whether the claimant can perform other work in the national economy given her age, education, residual functional capacity, and work experience. 20 C.F.R. §§ 404.1520, 404.1521.

29. Residual functional capacity describes the range of work the claimant can perform despite his impairments based on all relevant evidence. 20 C.F.R. § 404.1545.

by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir.1987), *rev'd on other grounds, Winford v. Chater,* 917 F.Supp. 398 (E.D.Va.1996). After review, the Court is empowered by 42 U.S.C. § 405(g) to affirm, modify, or reverse the decision of the Commissioner with or without remanding the case for a rehearing. *See Melkonyan v. Sullivan,* 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).

■ The claimant bears the burden of production of proof in showing that he meets the qualifications for finding disability [30] in the first four steps of the traditional five-step inquiry.[31] *See* 20 C.F.R. § 404.1520; *Pass v. Chater,* 65 F.3d 1200, 1203 (4th Cir.1995); *see also Coffman v. Bowen,* 829 F.2d 514, 518 (4th Cir.1987). If he meets the requirements of the first four steps, the claimant has shown that he is *prima facie* disabled. *See Pass,* 65 F.3d at 1203. At the fifth step, the Commissioner bears the burden to show that the claimant nonetheless is not disabled because, despite his impairment, he retains the residual functional capacity to perform work available in the national economy. *See id.*

### Analysis

The claimant makes several arguments on appeal. He maintains that the ALJ (1) failed to consider whether his condition met or equaled impairment listing 1.05C; (2) improperly ignored the opinion of his treating physician; (3) improperly evaluated his complaints of pain finding him not credible; and (4) posed a hypothetical to the VE that did not include all of his impairments and improperly relied upon the testimony of the VE. (Paper Nos. 6, 8).

---

**30.** The Social Security Act defines a disability as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for

This case will be remanded for further proceedings on two points: (1) determination of whether the claimant was disabled for a closed period of 12 months or more and (2) analysis of whether the evidence demonstrates that he meets the Listing 1.05. The claimant's other arguments, however, are without merit and each will be addressed in turn.

### A. *The ALJ Did Not Consider Whether the Claimant's Alleged Disability Fulfilled the Durational Requirement of 12 Months.*

■ The regulations state that a person is disabled if he is unable to do any substantial gainful activity due to a medically determinable impairment which "can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505. *Accord* 20 C.F.R. § 404.1509 (defining the "duration requirement" as an impairment that "must have lasted or must be expected to last for a continuous period of at least 12 months."); *Smith v. Sullivan,* 769 F.Supp. 1386, 1395 (E.D.Va.1991); *Schaffer v. Califano,* 433 F.Supp. 1218, 1223–1224 (D.Md. 1977); *Nelson v. Gardner,* 271 F.Supp. 800, 808 (S.D.W.V.1967). The ALJ did not address whether the claimant was disabled for a period of at least 12 months and whether he would be entitled to receive some disability benefits for the duration of his alleged disability.

The claimant argues that Dr. Cooney repeatedly indicated that he was "temporarily totally disabled" or "disabled," citing to numerous documents in the record. (Paper No. 6 at 13). The claimant's alleged onset date was September 23, 1994. (R. 48). His treating physician, Dr. Cooney, noted on November 3, 1994, February

---

a continuous period of not less than 12 months." 42 U.S.C. § 400 *et seq.*

**31.** *See supra* n. 20. (describing the traditional five step analysis used by an ALJ in evaluating a disability).

9, 1995, March 22, 1995, and June 21, 1995 that the claimant was "temporarily totally disabled." (R. 101, 131, 133, 160). On February 21, 1996, Dr. Cooney stated that the claimant "remains disabled." (R. 195). Although there was no mention after February 1996 that the claimant was "disabled," the claimant was considered to be incapable of working by his treating physician for a period of at least 17 months— from September 23, 1994 to February 21, 1996. If the claimant is found to be disabled during this 7 month period or some other period of 12 months or longer, he may be eligible to receive benefits for that time span.[32]

Dr. Cooney's statements are strong evidence of claimant's disability for longer than 12 months, possibly up to 17 months (if not permanently). On remand, the ALJ should consider whether the claimant met the durational requirement of 12 months and whether he should receive benefits for a closed period of disability.

**B. *There Was Sufficient Evidence in the Record of Vertebrogenic Disorder to Require Specific ALJ Discussion***

The claimant argues that the ALJ should have specifically considered Listing 1.05C in his decision since the claimant suffers a disorder of the spine. (Paper No. 6 at 9). The claimant relies heavily on *Cook v. Heckler*, 783 F.2d 1168 (4th Cir. 1986), to advance his argument. (*Id.*). *Cook* held that when there is "ample evidence in the record to support a determination" that the claimant's impairment meets or equals one of the listed impair-

ments, the ALJ must identify "the relevant listed impairments" and compare "each of the listed criteria to the evidence of [the claimant's] symptoms." *Id.* at 1172, 1173.

Under *Cook*, the duty of identification of relevant listed impairments and comparison of symptoms to Listing criteria is only triggered if there is ample evidence in the record to support a determination that the claimant's impairment meets or equals one of the listed impairments. Neither the Social Security law nor logic commands an ALJ to discuss all or any of the listed impairments without some significant indication in the record that the claimant suffers from that impairment. In a series of unpublished opinions, the Fourth Circuit has endorsed this interpretation of *Cook*. "*Cook*, however, does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases." *Russell v. Chater*, 60 F.3d 824, 1995 WL 417576, *3 (4th Cir.1995) (unpublished disposition). The ALJ, in *Russell*, as in this case, observed that the plaintiff's impairment was not severe enough to meet or equal a listed impairment. *See id.* at *2. The plaintiff argued that the ALJ should have compared his symptoms to the listed impairments in applicable regulations and that his failure to do so made judicial review impossible. *See id.* The Court, however, disagreed and found that the facts were different from those in *Cook*. *See id.* at *3. The Court explained that in *Cook*,

a number of listed conditions were potentially applicable, but we could not sort through the possibilities because of

**32.** Dr. Cooney's statement that the claimant "remains disabled" may not have been an indication of the claimant's long-term employment potential; in fact, on February 15, 1996, six days prior to filling out the Physical Capacities Evaluation, Dr. Cooney told the vocational consultant that the claimant was 25% disabled, thus rebutting the presumption that the claimant was totally disabled at that time. (R. 192). However, the 25% rating, given by Dr. Cooney, is an impairment rating used by the workers' compensation insurer. The Commissioner is not bound by impair-

ment ratings made by other government agencies in order to make a determination of a claimant's disability. *See* 20 C.F.R. § 404.1504. *See also Hicks v. Gardner*, 393 F.2d 299 (4th Cir.1968) ("[T]he Court is not bound to the degrees of disability found by the Compensation Commission."). Thus, the ALJ is not required to address or use the disability rating in determining his findings. In any event, Dr. Cooney stated that the claimant was temporarily totally disabled until June 1995. (R. 133).

the ALJ's cursory and internally inconsistent findings; here, the ALJ discussed the evidence in detail and amply explained the reasoning which supported his determination. There is thus no impediment to judicial review in the case before us.

*Id. Accord Henderson v. Apfel,* 179 F.3d 507, 1999 WL 178628, *5 (7th Cir.1999) (unpublished disposition) ("[A]lthough the ALJ did not specifically address subsection (B) of the Listing, the Commissioner is correct that the record amply supports the ALJ's implicit conclusion that [the plaintiff] did not meet or equal that subsection.").

Similarly, in *Green v. Chater,* 64 F.3d 657, 1995 WL 478032, *3 (4th Cir.1995) (unpublished disposition) the ALJ found that the plaintiff had not met or equaled a listed impairment. The Court noted that the ALJ addressed each of the plaintiff's impairments and discussed why he found the plaintiff's symptoms not credible. *See id.* Therefore, the *Green* Court decided that the ALJ had adequately explained his evaluation of the plaintiff's impairments, even though he did not explicitly address why specific listings were not met. *See id.* Another case that distinguished *Cook* was *Lyall v. Chater,* 60 F.3d 823, 1995 WL 417654, *1 (4th Cir.1995) (unpublished disposition), where the plaintiff argued that the ALJ had "failed to conduct a sufficiently detailed analysis of [his] impairments in concluding that the impairments did not

match in severity any 'listed impairment'...." The Court differentiated *Cook* by holding that the ALJ's analysis "was not confusing or internally inconsistent, as was the ALJ's cursory analysis we held to be deficient in *Cook v. Heckler* ... but rather was sufficiently comprehensive as to permit appellate review." 60 F.3d 823, 1995 WL 417654 at *1.

■ This case is, however, more akin to *Cook* than *Russell, Green,* and *Lyall.*[33] In *Cook,* there was sufficient objective medical evidence to arguably support the severity of the plaintiff's impairments; the plaintiff, as reported by the ALJ, had arthritis, a history of joint pain, and significant limitations of motion—symptoms that corresponded with some or all of the requirements of Listings 1.02, 1.03, and 1.04. *See* 783 F.2d at 1172. *Russell, Green,* and *Lyall* were cases in which the ALJ did not specifically explain why he rejected certain listings, however, the Courts all held that their explanations were sufficient given the evidence in the records. *See Russell,* 60 F.3d 824, 1995 WL 417576 at *3; *Green,* 64 F.3d 657, 1995 WL 478032 *3; *Lyall,* 60 F.3d 823, 1995 WL 417654 at *1.

The ALJ, in this case reported that the claimant had "no impairment" which met or equaled a listed impairment, but without any identification of any specific Listing or comparison of claimant's symptomatology to Listing criteria. The ALJ further explained that "[n]o treating or

33. The Commissioner also argues that *Cook* is distinguishable from this case because *Cook* involved an application for widow's insurance benefits under 42 U.S.C. § 402(e), whereas disabled wage earners receive social security benefits under 42 U.S.C. § 423(a). *See id.* at 1169. It is argued, therefore, that *Cook* was decided under a different standard of disability, which "is based on medical evidence pertaining to physical or mental impairments alone; age, education, and work experience are not considered, nor is the availability of the national economy." *Id.* at 1170. Thus, in *Cook,* if the plaintiff were to show an impairment that met or equaled a listing, the disability inquiry would have ended and there would have been no step four or five analysis, as

there is in this case. The Commissioner argues that the analysis is different because the claimant, in this case, could be awarded benefits at step four or five, even though his impairments were found not to meet or equal a listing at step three.

The Commissioner's argument is flawed. The fact that there are two more steps in the analysis for wage earners does not allow an ALJ to ignore any required procedures at step three. *Cook* is not distinguishable in the manner the Commissioner argues here: at step three, the ALJ is to decide whether a claimant meets a listing without considering age, work experience, or education, which is the same standard used for widow's benefits. *See* 20 C.F.R. §§ 404.1577, 404.1520(d).

examining physician has mentioned findings equivalent in severity to the criteria of any listed impairments." (*Id.*). Here, the ALJ discussed the evidence in some detail, but did not explain sufficiently the reasoning for his determination. He did not compare the medical evidence that he identified in the record with the criteria of Listing 105.C. Rather, his own summary of the medical evidence in the record is sufficiently suggestive of a vertebrogenic disorder, as defined in the Listings to mandate an explicit comparison of symptomatology to Listing criteria.[34] Listing 1.05C states the following:

> Other vertebrogenic disorders (e.g. herniated nucleus pulposus, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months. With both 1 and 2:

1. Pain, muscle spasm, and significant limitation of motion in the spine; and

2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss. 20 C.F.R., Ch. III, Part 404, Subpt. P, App. 1.

First, the ALJ specifically found that claimant had "residual herniated nucleus pulposus" (R. 17), which is an example of a vertebrogenic disorder mentioned in Listing 105.C.

Second, the ALJ's medical summary notes incidents of claimant's pain, muscle spasm and significant limitation of the motion in claimant's spine. Listing 1.05C(1). (*See* R. 18).[35] Moreover, the ALJ noted evidence of radicular distribution of significant motor loss with motor weakness and sensory and flex loss. (Listing 1.05C(2)).[36]

---

**34.** In addition to the medical evidence noted by the ALJ, there are other relevant references in the record: Nine months after the claimant's first surgery, Dr. Hanley reported, on February 16, 1994, that the claimant had "some restrictions of motion" and could flex about 40 degrees before experiencing pain. (R. 71). On November 11, 1994, the claimant's treating neurosurgeon, Dr. Cooney, noted that the claimant could "flex his lumbar spine 70 to 80 degrees." (R. 101). Further, on February 14, 1995, one month after the claimant's second surgery, Dr. Smith observed some residual spasm in the lumbar spine, but found no "gross motor weakness." (R. 144). On March 22, 1995, Dr. Cooney reported that the claimant had "limitation of flexion of the lumbar spine," but nevertheless recommended that the claimant "increase his exercises." (R. 131) On May 4, 1995, Dr. Cooney again advised the claimant to exercise more regularly and to "try to swim." (R. 132). Additionally, an independent evaluator, Dr. Schreiber, reported, on May 26, 1995, that the claimant had "normal sensory and motor function" and recommended that the claimant could probably perform sedentary or light work. (R. 164–165).

Before the claimant's third surgery, his orthopedic surgeon, Dr. Schneider, noted, on April 16, 1996, "a reduced range of motion in the lumbar spine" but "no significant spasm." (R. 189). Four months after the claimant's third surgery, Dr. Schneider reported, on October 29, 1996, that the claimant's back pain had improved and stated that the claimant could work in a light duty position. (R. 278). Finally, on December 30, 1996, Dr. Schneider noted that the claimant said he was doing better and had no significant pain. (*Id.*). Dr. Schneider opined that the claimant was capable of performing light duty work. (R. 279).

**35.** The following are the specific references in the decision, relevant to Listing 1.05C(1):

> Dr. Hieb's examination showed that the claimant's range of motion of the back was severely limited.
> The claimant was complaining of back pain as well as radicular pain.
> The claimant still had palpable spasm in the back, his range of motion was guarded and somewhat limited because of pain and spasm.
> (R. 18–19).

**36.** The following are the specific references in the decision, relevant to Listing 1.05C(2):

> After the injury the claimant tried to continue working but he became asymptomatic the next day with pain and tingling through his right buttock down his right leg to his right heel. He complained of right leg weakness causing him to feel unsteady almost to the point of falling.
> The claimant was in unimproved severe pain.
> The claimant was complaining of back pain as well as radicular pain.

(R. 17). Accordingly, and because a remand is necessary for the reasons stated above, the ALJ will also consider on remand whether the medical evidence supports a conclusion that the criteria for Listing 1.05 has been met. (R. 17).

### C. *The Claimant's Other Arguments Are Without Merit.*

Although this case is being remanded for further proceedings, this Court does not find merit in the claimant's other arguments. Each of her remaining assertions will be addressed below.

1. *The ALJ Properly Considered the Opinion of the Claimant's Treating Physician.*

 The claimant argues that the ALJ ignored the opinion of the claimant's treating neurosurgeon, Dr. Cooney. (R. 195–196, Paper No. 6 at 12). The claimant specifically argues that the ALJ failed to consider various limitations listed by Dr. Cooney in a Physical Capacities Evaluation on February 21, 1996 and that such a failure constitutes reversible error. (R. 195–196, Paper No. 6 at 13, 19). The claimant's arguments, however, are without merit.

Treating physicians' opinions should be given controlling weight. 20 C.F.R. § 404.1527(d)(2) sets out the guidelines for treating physicians:

Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a

unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors in paragraphs (d)(3) through (5) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

From the language of the regulation, it is apparent that a treating physician is a medical professional that examines a patient on several occasions over a long period of time. The treatment relationship is determined by the length of the treatment relationship, the frequency of the examination, and the nature and extent of the treatment relationship. *See* 20 C.F.R. § 404.1527(d)(2)(i, ii) Concerning the length and frequency of examinations, the regulations explain that a physician will only be regarded as a treating physician if he has seen the patient "a number of times and long enough to obtain a longitudinal picture of [the patient's] impairment." *Id.* at § 404.1527(d)(2)(i). *See also Campbell*

---

Dr. Robert Smith opined that this segmental instability could be the source of the claimant's back pain and described the claimant's impairments as a disc lesion, a segmental instability, and epidural fibrosis, loss of function and endurance, and recurrent episodes of pain.
The claimant's pain in his back was radiating into the left buttock and thigh. Prior to the January, 1993 operation it had been radiating to the right side. By September 27, 1994 his progress report showed that

he'd had one episode where the left leg had buckled.
The claimant had some decreased range of motion of the lumbar spine but also normal sensory and motor function in both lower extremities.
In April, 1996, Montgomery Orthopaedics, reviewed the claimant's case. Mr. Ketcher presented with complaints of low back pain as well as pain in both buttocks, thighs, and occasionally into the feet.
(R. 18–19)

*v. Bowen,* 800 F.2d 1247, 1250 (4th Cir. 1986) ("[T]he opinion of a treating physician is entitled more weight because it reflects a judgment based on a continuing observation over a number of years."); *Oppenheim v. Finch,* 495 F.2d 396, 398 (4th Cir.1974); *Vitek v. Finch,* 438 F.2d 1157, 1160 (4th Cir.1971).

Dr. Cooney is clearly the claimant's treating physician: he has seen the claimant numerous times over a period of three years, with 21 visits documented in the record. On February 21, 1996, Dr. Cooney noted, in a Physical Capacities Evaluation, that the claimant could not use his hands or feet for pushing or pulling and was unable to use his feet for repetitive movements. (R. 195). The claimant argues that these restrictions were not included in the hypothetical posed to the VE. (Paper No. 6 at 13). The ALJ, however, found that the claimant could only perform a limited range of sedentary work, which does not require pushing, pulling, or repetitive foot movements. *See* 20 C.F.R. § 404.1567(a). As the Commissioner correctly points out, light work [37] would require the performance of such functions. Nevertheless, the ALJ only found that the claimant could do sedentary work, and therefore, the claimant's restrictions on pulling, pushing, and repetitive foot movements are irrelevant.

The claimant next argues that Dr. Cooney's statements that the claimant could not bend, squat, crawl, climb, or reach were not included in the ALJ's hypothetical. (R. 195–196, Paper No. 6 at 13, Paper No. 8 at 2). With respect to the claimant's restriction on bending, the ALJ stated, in his hypothetical, that the claimant "should avoid any bending." (R. 304). Although

the ALJ did not specifically state that the claimant should not squat, crawl, climb, or reach, he did include that the claimant "should avoid frequent or prolonged stooping, kneeling, or crouching." (*Id.*). The ALJ specified the claimant's limitations, but not in the exact terms used by Dr. Cooney.[38] Furthermore, the *Dictionary of Occupational Titles* ("DOT") does not require squatting, crawling, or climbing for the positions listed by the VE. *See* §§ 194.387–010 (quality control inspector), 209.562–010 (general clerk), 211.362–010 (cashier), 239.567–010 (clerical office helper). Although the DOT indicates that these positions require frequent reaching, Dr. Cooney's opinion that the claimant is incapable of reaching is inconsistent with the evidence in the record.

On May 26, 1995, Dr. Schreiber, an independent medical examiner, opined that the claimant could not engage in repetitive bending, stooping, or lifting, but did not state any limitations in his reaching capabilities. (R. 165). Dr. Cooney, himself, advised the claimant numerous times to increase his physical activities and exercise, including swimming. (R. 131–132, 183, 185). Thus, Dr. Cooney's own conclusion that the claimant could not reach is inconsistent with other physician's statements and his own advice.

The claimant's other physicians opined that he could perform sedentary or light duty work. Drs. Smith and Schreiber both reported that the claimant could perform sedentary work. (R. 150, 165). On March 8, 1994, an orthopedic surgeon, Dr. Smith, recommended that the claimant stay on light duty status and a void heavy

37. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job in this category when it requires a good deal walking or standing, or when it involves sitting most of the time with *some pushing and pulling of arm or leg controls.* To be considered capable of performing a full or wide range of light work, you must have

the ability to do substantially all of these activities." ·20 C.F.R. § 404.1567(b) (emphasis added).

38. In fact, the ALJ used that terms from in the *Dictionary of Occupational Titles* that most closely corresponded to the restrictions mentioned by Dr. Cooney.

work. (R. 150). Dr. Schreiber,[39] on May 26, 1995, stated that the claimant could perform sedentary or light work. (R. 165). The claimant's treating orthopedic surgeon, who performed his third surgery, Dr. Schneider, opined, on October 29, 1996 and December 30, 1996, that the claimant could perform light duty work. (R. 278–279).

Finally, the claimant cites to Dr. Schneider's statement that he is to work part-time and Dr. Hanley's opinion that the claimant can perform sedentary work and argues that the ALJ does not point to evidence that contradicts these findings. (Paper No. 6 at 14–15). Although Dr. Schneider states that the claimant should work part-time, he goes on to state that he should, over a period of several months, increase his schedule back to a 40–hour work week. (R. 279). There is no need to contradict the reports of Dr. Schneider and Dr. Hanley since they clearly support the ALJ's conclusion that the claimant can perform sedentary work. Therefore, the ALJ properly considered Dr. Cooney's opinion with respect to the evidence in the record.

### 2. The ALJ Properly Evaluated the Claimant's Subjective Complaints of Pain in His Determination of the Claimant's Credibility.

■ The claimant argues that the ALJ did not consider the threshold question of whether objective medical evidence concerning the claimant's impairments demonstrated that the impairment was capable of causing the degree and type of pain alleged. (Paper No. 6 at 21). The claimant further argues that the ALJ's determination of his credibility was flawed. (Id.). The ALJ, however, properly considered the claimant's subjective complaints of pain and explained his reasoning for why he found the claimant not credible.

In considering a claimant's subjective complaints, an ALJ is directed by 20 C.F.R. § 404.1529 to engage in a two step process. The ALJ must first determine if the alleged pain could reasonably result from the medically determined impairment. See 20 C.F.R. § 404.1529(b). If it is determined that the claimant's allegations of pain are reasonable, the ALJ proceeds to step two where he must determine the effect of the pain on the claimant's ability to work. In doing so, the ALJ must consider all the available evidence of the pain itself, including medical history and signs, laboratory findings, and statements from the claimant and his doctors. See 20 C.F.R. § 404.1529(c)(2). Accord Craig v. Chater, 76 F.3d 585, 591 (4th Cir.1996) ("[S]ubjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant.").

The ALJ first determined that the claimant has "lumbar disc disease, status post back surgery, with residual herniated nucleus pulposus" and cited to Exhibit 11. (R. 17). The ALJ also stated that "[t]his condition has more than a minimal effect on his functional capacity and is therefore 'severe.' " (Id.). The ALJ next considered the effects of the claimant's pain on his ability to do work and cited to specific reasons for finding the claimant's allegations of pain not credible. (R. 19–21). He found the claimant not credible due to his "lack of adherence to instructed medical care, his failure to follow through on vocational rehabilitation or a job hardening program, and in light of his activities of daily living." (R. 20).

The claimant argues that the ALJ's failure to address whether the claimant's im-

---

**39.** The claimant correctly points out that the ALJ mistook Dr. Schreiber for Dr. Schneider and attributed him the status of treating physician, whereas Dr. Schreiber was an independent medical examiner. (R. 20). However, this mistake is harmless error given the other evidence on the record, especially the statements by Dr. Schneider that state that the claimant can perform sedentary activities. (R. 278–279).

pairment was capable of causing the degree of pain alleged was reversible error. (Paper No. 6 at 21). Although the ALJ did not specifically state that the claimant's alleged pain could result from these medically determined impairments, it is clear that the ALJ made this determination since he noted that the impairments were "severe" and affected his functional capacity. (*Id.*). Even if the ALJ failed to make an express finding at step one of the pain analysis, the ALJ correctly applied step two of the analysis. A similar situation arose in *Mickles v. Shalala,* 29 F.3d 918, 920–21 (4th Cir.1994), where the ALJ did not address whether objective evidence corroborate the plaintiff's allegations of pain. However, in *Mickles,* the Court held that

> [t]he only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life.... [and] [b]ecause the ALJ conducted the proper analysis in a comprehensive fashion and cited substantial evidence to support his finding, and because there is no question that he would have reached the same result notwithstanding his initial error, [this court] would affirm.

*Id.* at 921. Therefore, a lack of an explicit finding at the first step of the required pain analysis does not constitute reversible error if the ALJ cites to substantial evidence to support his overall finding on his subjective complaint of pain.

As mentioned earlier, the ALJ cited to specific reasons that led to his conclusion that the claimant was not entirely credible. (R. 20). The ALJ first cited to the claimant's lack of adherence to instructed medical care. (R. 20). Although the claimant argues that the ALJ failed to "refer specifically to the evidence informing" his decision, the ALJ thoroughly explained how he arrived at this conclusion. (Paper No. 6 at 22, R. 20–21). The ALJ noted that, after his third surgery, the discharge summary stated that the claimant was to wear his brace full time. (R. 20, 217). However, Dr. Schneider, on July 25, 1996, reported

that he fell in his backyard because he was not wearing his brace. (R. 186). The claimant argues that he was not told of the information on the discharge summary and that the discharge summary was written ten days after the surgery. (Paper No. 6 at 24). However, the discharge summary specifically stated that the claimant "is to wear his brace full time. *Instructions have been given.*" (R. 217) (emphasis added). It is therefore clear that the claimant knew he was supposed to wear his brace. The date of transcription of the discharge summary is irrelevant and is no reason to question the veracity of the document. The claimant states that his instructions appear in the record at R. 268, and state: "[a]mbulate as tolerated with or without corset (per physician's instructions)" and that there is no evidence that the claimant was told to wear his brace full time. (Paper No. 6 at 25). On the discharge summary, however, Dr. Schneider stated that he told the claimant to wear the brace full time and the discharge summary given to the claimant also stated that the claimant was to discuss the instructions with his physician and to wear the corset, as instructed by his physician. (R. 217, 268). Furthermore, the claimant told Dr. Schneider, on July 25, 1996, that his brace was "uncomfortable" and that he was removing it "a lot." (R. 186). The claimant had specific instructions to wear his brace all the time and discomfort was not a legitimate reason to ignore a physician's instructions without consulting him first.

The ALJ then cited to the claimant's failure to follow through with vocational rehabilitation or a job hardening program. (R. 20). The claimant argues that he did not undergo vocational training because of medical considerations. (Paper No. 6 at 25). However, the record indicates that, on December 9, 1994, Dr. Cooney released the claimant to work on a full-time basis, given some restrictions. (R. 82). The claimant also argues that ITT Hartford, the claimant's employer's workers' compensation carrier, was in charge of funding

the claimant's vocational treatment. (Paper No. 6 at 25). However, on December 31, 1994, the rehabilitation consultant, assigned by ITT Hartford, after giving the claimant potential job options, noted that the claimant was not involved in an employment search. (R. 90). The ALJ also cited to the June 21, 1995 record, in which Dr. Cooney noted that the claimant was offered a job chucking clams, but refused because it did not pay well, not because of his alleged disabling pain. (R. 19, 133).

Third, the ALJ cited to the claimant's daily activities to support his conclusion that the his complaints of pain were not entirely credible. (R. 20–21). The ALJ noted that the claimant drives to visit his doctors, prepares dinner every night, visits relatives, and was able to go to vacation in Hawaii. (R. 21). The claimant testified that he was able to drive one-third of the two-hour trip to visit his doctor once a month. (R. 290–291). The claimant also testified that he could climb the stairs in his house four times a day and he cooks dinner with his son, washes dishes, dusts, and visits his family. (R. 291–293). The claimant stated that he had a nine-day vacation in Hawaii and told Dr. Cooney that he was able to do a considerable amount of walking there. (R. 184, 295–296). Furthermore, the ALJ observed that "[h]e obviously managed the sitting and standing required to get through his travel arrangements and arrive at his destination." (R. 21). Finally, on December 30, 1996, Dr. Schneider reported that the claimant had no significant pain and could perform light duty work. (R. 278–279).

The claimant argues that his activities are minimal and that there is no indication that his activities were performed on a sustained basis. (Paper No. 6 at 26–27). He cites to a First Circuit case, *Waters v. Bowen*, 709 F.Supp. 278 (D.Mass.1989) for support of his argument. (*Id.*). In *Waters*, the ALJ found that the plaintiff was not credible because she " 'testified that she is capable of lifting two shopping bags at a time, doing housework, driving short distances and crocheting.' Many circuit and district courts have held that such evidence is insufficient to establish the ability to engage in substantial gainful activity." *Id.* at 284. However, the Court went on to say that "[t]his is so because such tasks can be performed intermittently, when the individual is not experiencing severe pain or before the pain cause by such activity becomes overwhelming." *Id.* In this case, the ALJ cited to, among other things, the claimant's ability to regularly drive for extended periods of time. (R. 21). This activity is not intermittent, as were the activities in *Waters*.

The claimant's last argument with respect to credibility is that the ALJ failed to give a legitimate reason for disregarding the claimant's allegations, failed to take into consideration the factors listed in Social Security Ruling 96–7p, and did not set forth the weight he attributed to the evidence which influenced his credibility determination. (Paper No. 6 at 28). First of all, the ALJ listed three specific reasons which led to his credibility determination and he explained how he arrived at those reasons. (R. 19–21). Social Security Ruling 96–7p requires that the ALJ consider the following:

the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about that symptoms and how they affect the individual, and any other relevant evidence in the case record.

The ALJ did consider the entire record, and addressed objective medical evidence as well as the subjective complaints made by the claimant. (R. 18–21).

Finally, the claimant's argument that the ALJ did not afford specific weight to the evidence which influenced his credibility determination is flawed. According to 20 C.F.R. § 1529 and the two-step process outlined in *Craig v. Chater*, the ALJ does not have to address the weight he affords

to evidence. The ALJ would have to address the weight he gives to treating and non-treating physicians, but this is not the issue at hand. *See* 20 C.F.R. 1527.

Thus, the ALJ properly evaluated the claimant's subjective allegations of pain and his determination that the claimant was not credible was based on substantial evidence.

### 3. The ALJ's Hypothetical Posed to the VE Included All of the Claimant's Impairments and He Properly Relied on the VE's Testimony.

The claimant argues that the ALJ's hypothetical did not include all of the claimant's impairments and that the ALJ improperly relied on the VE's testimony. (Paper No. 6 at 28, Paper No. 8 at 2). The ALJ's hypothetical, however, included all of the claimant's impairments and the VE's testimony was accurate and properly relied upon by the ALJ.

As stated in part (B) of this opinion, the ALJ properly included all of the claimant's limitations in his hypothetical. "In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all [ ] evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir.1989) (citation omitted). In this case, the VE's testimony was not only based upon his observation of the claimant's testimony, but was based on his knowledge of the record. (R. 303). The VE testified that he had reviewed "all of the vocationally-relevant exhibits in this case" and he was present for the entire hearing. (*Id.*). *See Diaz v. Secretary, Health & Human Servs.*, 898 F.2d 774 (10th Cir.1990) ("The fact that the vocational expert was present

and heard testimony concerning [the plaintiff's] alleged impairments suggests that the effect of the error, if any, in the [ALJ's] hypothetical, was minimal."). Therefore, the VE was familiar with the evidence in the record and understood the extent to which claimant's impairments limited his ability to work.

The claimant argues that the VE's testimony was flawed and therefore the ALJ's reliance upon it was improper. (Paper No. 6 at 28). The VE testified that he claimant was able to perform sedentary jobs such as a cashier, quality control worker, and general office clerk. (R. 305). The claimant asserts that the position of a general office clerk requires the residual functional capacity to perform light work, citing to Title 209.562–010 of the DOT, and therefore the claimant can not perform this job.[40] (Paper No. 6 at 28). Although the claimant is correct that this job requires light duty work, the VE still listed other types of sedentary work that could be performed by the claimant, despite his impairments. (R. 305). The VE also stated that his list of examples were not exhaustive and that the claimant could perform other sedentary jobs. (R. 306). Moreover, the DOT is not "the sole source of evidence concerning gainful employment." *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir.1994).

The Dictionary of Occupational Titles itself contains a disclaimer, moreover, noting that it provides only "composite descriptions of occupations as they may typically occur." The descriptions listed in the dictionary "may not coincide with a specific job as actually performed in a particular establishment or any given industry."

---

40. The claimant and Commissioner cite to two different listings from the DOT to describe a "general office clerk." The claimant cites to Title 209.562–010 which describes a "clerk, general (clerical)," or alternatively, "office clerk, routine." The Commissioner, however, cites to Title 239.567–010, which describes an "office helper (clerical)." One difference between these two listings is that Title 209.562–010 requires occasional stooping whereas 239.567–010 does not. Both occupational titles, however, indicate that the jobs are light duty (L).

*Id.* Therefore, the ALJ's reliance on the VE's testimony was appropriate.

Thus, the hypothetical posed to the VE was an accurate representation of the claimant's impairments and the ALJ's reliance on the VE's testimony was valid.

### *Conclusion*

For the above reasons, the Commissioner's decision is remanded. A separate order shall issue.