Catherine C. PERKINS, Plaintiff,

v.

Kenneth S. APFEL, Commissioner of the Social Security Administration, Defendant.

No. CIV. DKC–99–1528.

United States District Court, D. Maryland.

June 12, 2000.

Stephen F. Shea, Willoner, Calabrese & Rosen, PA, College Park, MD, for Plaintiff.

Allen F. Loucks, Office of the United States Attorney, Baltimore, MD, for Defendant.

## MEMORANDUM

GESNER, United States Magistrate Judge.

### I. *Background*

This action is brought pursuant to 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of the Social Security Administration denying plaintiff Catherine C. Perkins' claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 423. These motions have been assigned to the undersigned with the consent of the parties pursuant to 28 U.S.C. § 636(c) and Local Rule 301. The parties have filed cross-motions for summary judgment, and plaintiff has filed a response. (Paper Nos. 6, 7, and 11). No hearing is deemed necessary. Local Rule 105.6. For the reasons that follow, this Court grants plaintiff's motion for summary judgment, denies defendant's motion for summary judgment, and remands this case to the Commissioner for further proceedings consistent with this Memorandum.

Plaintiff applied for DIB on April 27, 1995, alleging disability beginning on January 15, 1994, due to cardiovascular disease, diabetes, peripheral neuropathy and a seizure disorder. (Record ("R") 8, 58–60, 77). The Social Security Administration denied her application initially and upon reconsideration. (R. 61–64 and 67–69). On June 2, 1997, plaintiff appeared with counsel before an administrative law judge ("ALJ"). In a written decision dated February 19, 1998, the ALJ determined that plaintiff was not disabled. (R. 5–22). On April 22, 1999, the Appeals Council denied plaintiff's request for review (R. 2–3), making the decision of the ALJ final and reviewable in this Court pursuant to 42 U.S.C. § 405(g).

## II. *Standard of Review*

The role of this Court on review is to determine whether substantial evidence supports the ALJ's decision and whether the ALJ applied the correct legal standards. 42 U.S.C. § 405(g) (1991); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). This Court cannot try the case *de novo* or resolve evidentiary conflicts but rather must affirm a decision supported by substantial evidence. *Hays*, 907 F.2d at 1456. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Teague v. Califano*, 560 F.2d 615, 618 (4th Cir.1977). It is more than a scintilla but less than a preponderance of the evidence presented. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984). It is such evidence sufficient to justify a refusal to direct a verdict if the case were before a jury. *Hays*, 907 F.2d at 1456. In reviewing for substantial evidence, the Court does not weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the agency. *Id.*

This Court must also determine whether the ALJ properly applied the law. "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law."

*Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir.1987).

In determining whether one is disabled, the Commissioner has promulgated regulations that set forth a five-step sequential evaluation procedure. *See* 20 C.F.R. § 404.1520. This five-step process, described by the Supreme Court in *Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), begins with the ALJ determining whether the claimant is engaged in substantial gainful activity as defined in 20 C.F.R. § 404.1571 and § 416.971 *et seq.* If the claimant is engaged in a substantial gainful activity, the claimant is considered not disabled. 20 C.F.R. §§ 404.1520(a) and 416.920(a). If the claimant is not engaged in a substantial gainful activity, the ALJ, at the second step, examines the physical and/or mental impairments alleged by the claimant and determines whether these impairments meet the durational and severity requirements set forth in 20 C.F.R. § 404.1520 and § 416.920.

If the durational and severity requirements are met, the ALJ's analysis proceeds to a third step—a consideration of whether the impairment or impairments, either severally or in combination, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, which is known as the Listing of Impairments ("Listing"). If one of the Listings is met, disability will be automatically found without consideration of age, education, or work experience. If a Listing is not met, however, the ALJ then moves to a fourth step and considers whether the claimant retains the residual functional capacity ("RFC") to perform past relevant work. If the ALJ finds that a claimant does retain the RFC to perform past relevant work, then the claimant will be found to be not disabled.

If a determination is made that the claimant is not capable of performing past relevant work, the ALJ moves to a fifth and final step and considers whether, based upon the claimant's RFC, age, edu-

cation, and past work experience, the claimant is capable of some other work. The burden shifts to the Commissioner at this step. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir.1995). If the claimant suffers solely from exertional impairments,[1] the Medical–Vocational Guidelines, as defined in part 404, Subpart P, Appendix 2 (the "Guidelines"), provide rules to be applied in determining whether a claimant is disabled. *Gory v. Schweiker*, 712 F.2d 929, 930 (4th Cir.1983). An ALJ, in applying the Guidelines, will examine the claimant's age, education, work experience, and residual functional capacity ("RFC") to determine which rule applies. *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984). The rule will direct a conclusion as to whether a claimant is disabled. *Gory*, 712 F.2d at 930.

The Guidelines, however, will not be used when the claimant suffers from both exertional and nonexertional impairments. *Smith v. Schweiker*, 719 F.2d 723, 725 (4th Cir.1984). In such a case, the ALJ is required to employ the use of a vocational expert to determine whether the claimant is still capable of some work. *Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir. 1983). If the claimant is not capable, disability will be found.

### III. *The ALJ's Decision*

The ALJ evaluated plaintiff's claim for DIB using the above-described, five-step sequential process set forth in 20 C.F.R. § 404.1520. At the first step, the ALJ determined that plaintiff had not engaged in substantial gainful activity since January 15, 1994. (R. 21). At step two, the ALJ determined that plaintiff's cardiovascular problems, diabetes mellitus, peripheral neuropathy and a seizure disorder were qualifying "severe impairment[s]." (*Id.*). Progressing to step three, the ALJ found that the impairments which he had identified as "severe" at step two did not meet or equal any listing in the Listing of Impairments set forth in 20 C.F.R. Pt. 404, Subpart P., App. 1. (*Id.*). At step four, the ALJ found that plaintiff retained the RFC to do her past relevant work as a bill collector or adjustment clerk. (*Id.*). The ALJ further determined that plaintiff's drug use was not a contributing factor material to the determination of disability[2] and concluded that plaintiff was not disabled. (R. 22).

### IV. *Summary of Evidence*

Ms. Perkins, a high school graduate, ranged in age from 44 to 47 years old during her alleged period of disability. (R. 8, 32). Her past relevant work included positions as a waitress, cashier, adjustment clerk and billing clerk. (R. 9, 32, 81, 85–90). Plaintiff last worked briefly as a waitress in 1994 before becoming ill and being hospitalized on January 27, 1995 for acute respiratory distress due to pulmonary ede-

---

1. Impairments may be exertional and nonexertional. An exertional impairment is one that affects the claimant's ability to meet the strength demands of certain jobs. 20 C.F.R. §§ 404.1569a and 416.969a. A nonexertional impairment is a "limitation that is present whether a claimant is attempting to perform the physical requirements of the job or not." *Gory v. Schweiker*, 712 F.2d 929, 930 (4th Cir.1983). "[W]here the claimant's impairment is nonexertional—not manifested by a loss of strength or other physical abilities—or is marked by a combination of exertional and nonexertional impairments, the [Guidelines'] Rules are not conclusive, and full individualized consideration must be given to all relevant facts of the case." *Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir.1983).

2. If addiction to drugs or alcohol is a "contributing factor material to the Commissioner's determination that [an] individual is disabled," then DIB is not available. *See* 42 U.S.C.A. §§ 423(d)(2)(C) and 1382c(a)(3)(J). This codification of the Contract with America Advancement Act of 1996, P.L. 104–121, precludes a finding of disability and payment of disability benefits to any individual whose claim was not favorably adjudicated prior to the law's enactment on March 29, 1996, if drug addiction or alcoholism would be a contributing factor material to a determination of disability.

ma, evidently caused by plaintiff's use of heroin and other toxic substances. (R. 144–48). She was treated with oxygen, steroids to reduce congestion and inflammation in her lungs, and insulin. (*Id.*). Upon discharge, she was prescribed a tapering dose of steroids, a blood sugar lowering drug, and Nicoderm Patches. (R. 144–45).

A few weeks later, she was again hospitalized due to chest pain, heart palpitations and shortness of breath. (R. 179). She underwent an echocardiogram which revealed moderate mitral valve regurgitation,[3] global hyperkinesis[4] of the left ventricle, and an ejection fraction[5] of 40%. (R. 183). X-rays of her chest showed congestion in her lungs. (R. 172–177). She was not found to have heart damage or clots in her pulmonary arteries, but she was treated for diabetes as well as lung and urinary tract infections. She was discharged a week later on antibiotics and oral hypoglycemics. (R. 180–81).

In April 1995, plaintiff underwent a Thallium[6] Stress Test which revealed poor exercise tolerance, leg pain possibly due to claudication[7] in both legs, and abnormal thallium images consistent with a high probability of clinically significant coronary artery disease likely involving three vessels. (R. 277–79). Due to her continuing chest pain, on June 3, 1995, plaintiff underwent cardiac catheterization.[8] (R. 234–36). This test revealed major vessel disease. (*Id.*). Plaintiff was diagnosed with extensive coronary artery disease, hypertension, diabetes mellitus, substance abuse, and congestive heart failure. (*Id.*). A three-vessel coronary artery bypass graft surgery[9] was performed the next day. (R. 235, 244–46). At discharge, plaintiff was prescribed a host of medications including, among others, Digoxin, Percocet, aspirin, and Nitroglycerin patches.[10] (R. 234–36). She was told to stop smoking and participate in a cardiac rehabilitation program (thirty minutes of exercise three times a week).

In August 1995, plaintiff was reevaluated at Howard University's outpatient cardiology clinic and reported not using drugs and smoking less since her bypass surgery. Plaintiff was advised to continue her medications, stop smoking completely, and enter cardiac rehabilitation. (*Id.*).

On August 15, 1995, plaintiff's cardiovascular surgeon, Nozika J. Nwaneri,

3. Mitral regurgitation refers to the backward flow of blood through a defective heart valve. *See Mosby's Medical Dictionary* 1015 (3d ed.1990).

4. Hyperkinesis is defined as abnormally increased muscular function or activity. *See Dorland's Medical Dictionary* at 795 (28th ed.1994).

5. The ejection fraction is the proportion of the volume of blood in the ventricles at the end of diastole (the period of dilatation when blood enters the relaxed chambers of the heart from the systemic circulation and the lungs) that is ejected during systole (the period of contraction of the heart); it is the stroke volume divided by the end-diastolic volume, often expressed as a percentage. It is normally 65 plus or minus 8%; lower values represent ventricular dysfunctions. *Dorland's* at 462, 660, 1653.

6. Thallium is a radioactive isotope used as a diagnostic aid. *Dorland's* at 1694.

7. Claudication is a weakness of the legs accompanied by cramping pain in the calves and caused by poor circulation of the blood to the leg muscles. *Mosby's* at 264.

8. Cardiac catheterization involves "the passage of a small catheter through a vein in an arm or leg or the neck and into the heart." *Dorland's* at 280. This procedure is performed to collect blood samples, determine pressure within the heart, detect heart problems and plan for surgery. *Id.*

9. Coronary artery bypass surgery involves grafting a section of vein between the aorta and a coronary artery at a point beyond where the artery has an obstructive lesion. *Dorland's* at 242.

10. Digoxin increases the force of myocardial contraction. *Physicians' Desk Reference* 1214 (54th ed.2000). Percocet is a narcotic used for relief of moderate to moderately severe pain. *Id.* at 1037. Nitroglycerin patches are indicated for prevention of chest pain due to coronary artery disease. *Id.* at 1474.

completed a Maryland Disability Determination Services ("DDS") questionnaire, listing plaintiff's diagnoses as coronary artery disease with triple bypass surgery and claudication of the lower extremities. (R. 254). Dr. Nwaneri noted no end organ disease but concluded that plaintiff was "currently totally disabled ... [and] severely limited by peripheral vascular disease of the lower extremities." (R. 255).

On August 31, 1995, plaintiff underwent an aortofemoral bypass,[11] a right femoral popliteal bypass,[12] excision of part of her abdominal aorta, and repair of a ventral hernia. (R. 286–89). Due to the extensive nature of the surgery, a decision was made not to proceed with the left leg femoral popliteal bypass, but to perform that procedure at another time. (R. 289). The left femoral popliteal bypass procedure was performed in September 1995. (*Id.*).

In October 1995, a follow up examination revealed normal blood pressure, clear lungs, normal heart sounds, no edema in the extremities, asymptomatic peripheral vascular disease, and asymptomatic congestive heart failure. (R. 307–08).

In December 1995, DDS consultative cardiologist Gerald Shugoll examined plaintiff. (R. 311–14). He noted that plaintiff complained of recurrent sharp jabbing or dull pain in her chest lasting a few seconds and unrelated to exertion. (R. 312). He also noted that she reported being easily fatigued, becoming short of breath with exercise, having no trouble breathing at night, and not regularly performing any type of exercise. (*Id.*). Dr. Shugoll found a systolic murmur, normal peripheral pulses in both femoral arteries, and diminished but palpable popliteal pulses in both of her legs. (R. 313). A Doppler blood flow study showed no impairment of arterial blood flow to plaintiff's lower extremities, and x-rays showed evidence of the previous bypass surgery but normal heart size and normal lung fields. (*Id.*). The results of an exercise stress test were limited by plaintiff's leg tiredness (not pain) to a mild level of exertion and did not show a deficiency of blood supply to the heart. (*Id.*). Dr. Shugoll opined that plaintiff had no current angina pectoris [13] or congestive heart failure and no claudication. (R. 313–14). He concluded that plaintiff "had significant coronary and peripheral arterial disease but has had good result[s] from surgery in both areas and, although her exercise capacity is currently limited, probably mostly by impaired fitness, she should be capable of performing light work activity, from a cardiovascular point of view." (R. 313).

Plaintiff appears to have gone without medical care between October 1995 and September 1996. In September 1996, plaintiff was hospitalized for one week after complaining of cramps in her left hand. At the time of her hospitalization, she had elevated blood pressure and blood sugar, but she was not in cardiopulmonary distress. (R. 343–44). During plaintiff's second day in the hospital, the staff observed an involuntary tonic-clonic [14] movement of her left hand. (R. 345). A subsequent neurology consultation confirmed that plaintiff had suffered a focal seizure, and an anti-seizure medication was prescribed for her. (R. 349). Plaintiff was also prescribed medication to control her glucose

11. An aortofemoral bypass involves inserting an artificial blood vessel from the thoracic aorta to the femoral artery to bypass blockages in the aorta and iliac artery. *Dorland's* at 242.

12. A femoral popliteal bypass involves inserting an artificial blood vessel from the femoral to the popliteal artery to bypass blocked, narrowed, or injured segments. *Dorland's* at 243.

13. Angina pectoris is defined as "thoracic pain often radiating to the arms, particularly to the left, sometimes accompanied by a feeling of suffocation and impending death." *Dorland's* at 77.

14. A tonic-clonic movement is a "spasm or seizure consisting of a convulsive twitching of the muscles." *Dorland's* at 1719.

levels. (*Id.*). While in the hospital, plaintiff contracted a lower respiratory infection which was treated with antibiotics. (*Id.*). At the time of her discharge from the hospital, plaintiff was advised to return for follow up to the cardiology, neurology and endocrine clinics, and to undergo a CT scan of her head. (R. 349–50). A December 1996 clinic note indicated that a CT scan showed some evidence of a small stroke, possibly accounting for plaintiff's hand seizures. (R. 336).

In December 1996, plaintiff was examined by family practitioner, Dr. Nguyen, who noted that she had no chest pain and no heart murmur and that her lungs sounded clear. (R. 335, 340). He prescribed medications including Digoxin, sublingual nitroglycerin as needed, Dilantin and Glucotrol. (*Id.*). In February 1997, Dr. Nguyen treated plaintiff with antibiotics for right ear pain caused by ear mites. (R. 333).

In April 1997, Dr. Nguyen completed a form (later submitted to the Social Security Administration by plaintiff's attorney prior to the administrative hearing) indicating that plaintiff should avoid stress, extended mild physical exertion, and walking or standing more than two hours in an eight-hour day. (R. 352–54). Dr. Nguyen did not specify any lifting limitations, stating that this would depend on plaintiff's degree of distress. (R. 352–53). Dr. Nguyen checked "yes," indicating that plaintiff experienced difficulty breathing and chest pain with mild exertion and that this pain subsided with nitroglycerin. (R. 353). Dr. Nguyen did not indicate that plaintiff had any exercise stress test results and wrote "Refer to Howard University Cardiology Clinic" next to the question asking for clinical evidence of cardiac abnormality. (R. 354).

At the close of plaintiff's June 1997 administrative hearing, the ALJ requested updated cardiovascular medical evidence in order to make his decision. (R. 55–56). Accordingly, plaintiff underwent a consultative cardiology evaluation by Dr. Bachubhai G. Manejwala. (R. 362–64). Plaintiff reported that she still smoked one-half pack of cigarettes daily; did not use alcohol or heroin; and continued to suffer shortness of breath after walking more than one-half block, leg swelling, shortness of breath at night, and chest pain sometimes responding to nitroglycerin and unrelated to exertion. (R. 363). Dr. Manejwala noted that plaintiff was fairly well-developed and well-nourished, was in no distress, but was slow to respond to his questions. (*Id.*). He found that her heart size was clinically normal and that her heart was in normal sinus rhythm and without murmurs. (R. 364). Her lungs were clear, and she had no swelling in the extremities. (*Id.*). Her reflexes and coordination were normal. (*Id.*). However, an electrocardiogram showed abnormalities of the anterior artery, left atria and left ventricle. (*Id.*). Dr. Manejwala concluded that plaintiff had experienced multiple problems resulting from hypertension, diabetes, cardiovascular and vascular disease, and surgeries. (*Id.*). Her diabetes did not appear to have caused any kidney complications. (*Id.*). Plaintiff continued to take heart medications and still felt periodic chest pain. (*Id.*). Dr. Manejwala believed that generalized arteriosclerosis had caused plaintiff's stroke and that one of her heart medications might be the cause of her slowness in responding to his questions. (*Id.*). Dr. Manejwala noted that plaintiff's physical ability was drastically reduced because of her illnesses and surgeries, but that she had been well treated with medication and was "fairly well compensated." (*Id.*).

At her June 1997 hearing, plaintiff testified that her daily activities included cooking, washing dishes, grocery shopping, reading, watching four to five hours of television, smoking and occasionally visiting family and friends. (R. 36–38). She could not wash laundry but could fold clothes. (R. 36). She performed weekly housework such as dusting, mopping and light sweeping, resting between activities.

(R. 36–37). She napped two hours each day. (R. 37). She also indicated that her feet swelled and her buttocks fell asleep if she sat longer than one and one-half hours, and her fingertips turned white outside in cold temperatures. (R. 38–39). She further testified that she became short of breath after walking one-half block and got cramps in the back of the legs. (R. 38). She stated that her cardiologists and surgeons limit her to lifting up to fifteen pounds, told her not to push or pull, and told her to avoid getting overly tired and to nap every day. (R. 40–41). She reported daily chest pain which she attributed to walking and smoking. (R. 41–42).

The vocational expert who testified at the hearing categorized plaintiff's past work as a waitress and cashier as light, unskilled labor; her past work as a bill collection clerk as sedentary and unskilled; and her work as an adjustment clerk as sedentary, semi-skilled work. (R. 47–48).

## V. *Analysis*

Plaintiff presents six arguments in support of her position that the ALJ's decision denying her benefits is not supported by substantial evidence. The Court has considered each of plaintiff's arguments and finds, for the reasons discussed below, that four of them merit a remand of this case to the Commissioner.

**15.** 20 C.F.R. § 404.1520(c) sets forth the criteria for evaluation of disability, in part stating that:

> *You must have a severe impairment.* If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment, and are, therefore, not disabled.

Section 404.1521 follows:
> (a) *Non-severe impairment(s).* An impairment or combination of impairments is not severe if it does not significantly limited your physical or mental ability to do basic work activities.
> (B) *Basic work activities.* When we talk about basic work activities, we mean the

## A. *The ALJ Properly Determined that Plaintiff's Cataracts Were Not a Severe Impairment.*

■ Plaintiff contends that once made aware that plaintiff had bilateral cataracts, the ALJ should have questioned her about any symptoms, any treatment, and whether the cataracts impacted upon basic work activities pursuant to 20 C.F.R. § 404.1521(b).[15] (Paper No. 6 at 10). Plaintiff also contends that the ALJ should have obtained a consultative examination in accordance with 20 C.F.R. § 404.1519a.[16] (*Id.*).

The ALJ acknowledged that Ms. Perkins has cataracts but concluded that there was no evidence that this condition would interfere with her ability to do work. (R. 15). In reaching the conclusion that the cataracts were not a "severe" impairment, the ALJ also considered Ms. Perkins statements that she reads daily. (*Id.*).

Although plaintiff alleges that her cataracts are a disabling impairment (R. 67, 95), she has not produced any evidence that her cataracts cause any impairment. In fact, plaintiff indicated in a disability report that she reads for recreation and testified that she watched television extensively during the day. (R. 37, 80). There was medical evidence of bilateral cataracts (R. 189), but the medical evidence also indicated that plaintiff had no change in visual acuity. (R. 149). While the existence of a conflict, inconsistency, ambiguity

> abilities and aptitudes necessary to do most jobs. Examples of these include:
> . . .
> (2) Capacities for seeing, hearing, and speaking.

**16.** 20 C.F.R. Section 404.1519(a)(1) provides general guidance as to when a consultative examination should be obtained at the ALJ's behest and states, in pertinent part:

> (a)(1) *General.* The decision to purchase a consultative examination for you will be made after we have given full consideration to whether the additional information needed (e.g., clinical findings, laboratory tests, diagnosis, and prognosis) is readily available from the records of your medical sources.

or insufficiency in the evidence must be resolved through consultative examination,[17] and additional medical consultation is required if there is an indication of a change in condition that affects an individual's ability to work,[18] neither situation existed here. Accordingly, the ALJ's decision not to obtain additional consultative evidence concerning plaintiff's cataracts does not present a basis for remand of this case.

### B. The ALJ Did Not Err in Evaluating Claimant's Allegations of Pain.

■ Plaintiff asserts that the ALJ erred by not expressly considering the threshold question of whether the plaintiff had demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged as required by *Craig v. Chater,* 76 F.3d 585 (4th Cir. 1996).[19] (Paper No. 6 at 21, 23).

■ The Fourth Circuit has developed a two-part test for evaluating a claimant's allegations of pain. *Id.* at 594. The first prong of this test requires a determination that there is objective medical evidence of a medical impairment reasonably likely to cause the pain alleged by the claimant. *Id.* The second prong requires the ALJ to consider "the intensity and persistence of the claimant's pain, and the extent to which it affects [his] ability to work." *Id.* at 595. However, "a lack of an explicit finding at the first step of the required pain analysis does not constitute reversible error if the ALJ cites to substantial evidence to support his overall finding on [the claimant's] subjective complaint of pain." *Ketcher v. Apfel,* 68 F.Supp.2d 629, 651 (D.Md.1999).

17. *See* 20 C.F.R. § 1519a(b)(4).

18. *See* 20 C.F.R. § 1519a(b)(5).

19. Plaintiff testified that she experiences sharp pain in her chest almost daily both at rest and upon exertion, and that she has trouble walking due to leg cramps and swelling of

In this case, although the ALJ failed to make an explicit finding as to whether the plaintiff had demonstrated by objective medical evidence an impairment capable of causing her alleged pain, he provided substantial evidence to support his overall pain credibility determination that plaintiff's subjective complaints of pain were not entitled to full credibility and that she was limited to sedentary work. (R. 19). Therefore, there is no reversible error. The Court now turns to those issues which require a remand of this case to the Commissioner.

### C. The ALJ Erred by Failing to Discuss the Cardiovascular Listings for Which There Was Factual Support.

■ Plaintiff challenges the ALJ's finding at step three of the sequential analysis that her coronary artery disease, peripheral vascular disease, and chest pain and shortness of breath upon exertion did not meet or equal any of the cardiovascular system listings in the Listing of Impairments set forth in 20 C.F.R. pt. 404, Subpt. P, App. 1. (Paper No. 6 at 14). Plaintiff further argues that the ALJ's explanation as to why no listing was met was insufficient. (*Id.* at 13).

In evaluating an impairment, an ALJ must fully analyze whether plaintiff's impairment meets or equals a "listing" where there is factual support that a particular listing could be met. *See Cook v. Heckler,* 783 F.2d 1168, 1172 (4th Cir.1986) (remanded, in part, due to ALJ's failure to specifically identify relevant "Listing" and compare each of the listed criteria to evidence of claimant's symptoms). The ALJ's analysis must reflect a comparison of the symptoms, signs and laboratory findings concerning the impairment, in-

the feet. (R. 38, 41–42). While the ALJ "accept[ed] the fact that [plaintiff] does experience chest pain ... relieved by sublingual nitroglycerin," (R. 18), he did not find her overall symptomology of chest and leg pain and fatigue to be fully credible. (R. 19).

cluding any resulting functional limitations, with the corresponding criteria set forth in the relevant listing. *See* 20 C.F.R. Section 404.1526(a); *Cook*, 783 F.2d at 1172.

The two cardiac listings most pertinent to the evidence in Ms. Perkins' case are 4.04 "Ischemic heart disease" [20] and 4.12 "Peripheral arterial disease." [21] The ALJ stated that he had given "special consideration" to "Sections 3.00 (Respiratory System), 4.00 (Cardiovascular System), 9.00 (Endocrine System and Obesity) and 11.00 (Neurological)," but that "[n]o examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment." (R. 16).

The Commissioner acknowledges that plaintiff suffered from significant cardiovascular impairments between January 1995 and September 1995 but argues that

these conditions were corrected within six months of their diagnoses and that the ALJ, therefore, was not required to engage in a comparison of plaintiff's signs, symptoms, and laboratory findings with specific listings. (Paper No. 7 at 22). To support this argument, the Commissioner relies foremost on the consultative report of Dr. Shugoll who concluded, based on an examination in December 1995, that plaintiff had coronary artery disease and obstructive peripheral arterial disease but "no current angina pectoris or congestive heart failure" and "no claudication." (*Id.* at 25; R. 313).

Dr. Shugoll's findings, however, are not the most up-to-date medical evidence of record. At the conclusion of the hearing on June 2, 1997, the ALJ ordered an updated cardiac consultative examination because Dr. Shugoll's examination was more

**20.** Section 4.04 Ischemic heart disease; with chest discomfort associated with myocardial ischemia, as described in 4.00E3, while on a regimen of prescribed treatment ... with one of the [f]ollowing:

> B. Impaired myocardial function, documented by evidence (as outlined under 4.00C3 or 4.00C4b) of hypokinetic, akinetic, or dyskinetic myocardial free wall or septal wall motion with left ventricular ejection fraction of 30 percent or less, and an evaluating program physician, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise testing would present a significant risk to the individual, and resulting in marked limitation of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though the individual is comfortable at rest; OR
> C. Coronary artery disease, demonstrated by angiograph (obtained independent of Social Security disability evaluation), and an evaluating program physician, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise testing would present a significant risk to the individual, with both 1 and 2:
> 1. Angiographic evidence revealing:
> a. 50 percent or more narrowing of a nonbypassed left main coronary artery; or
> b. 70 percent or more narrowing of another nonbypassed coronary artery; or

> c. 50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or
> d. 50 percent or more narrowing of at least 2 nonbypassed coronary arteries; or
> e. Total obstruction of a bypass graft vessel; and
> 2. Resulting in marked limitation of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though the individual is comfortable at rest....

**21.** 4.12 Peripheral arterial disease. With one of the following:

> A. Intermittent claudication with failure to visualize (on arteriogram obtained independent of Social Security disability evaluation) the common femoral or deep femoral artery in one extremity; OR
> B. Intermittent claudication with marked impairment of peripheral arterial circulation as determined by Doppler studies showing:
> 1. Resting ankle/brachial systolic blood pressure ratio of less than 0.50; or
> 2. Decrease in systolic blood pressure at the ankle on exercise (see 4.00E4) of 50 percent or more of pre-exercise level at the ankle, and requiring 10 minutes or more to return to pre-exercise level; OR
> C. Amputation at or above the tarsal region due to peripheral vascular disease.

than a year old.[22] This updated consultative examination was conducted on June 26, 1997 by Dr. Manejwala. (R. 55, 362–364). The results of an electrocardiogram performed as part of the examination showed "poor anterior artery progression, left atrial enlargement and borderline criteria for LVH [left ventricular enlargement]."[23] (R. 364). In addition, Dr. Manejwala noted reduced pulses in plaintiff's feet and reported that plaintiff continued to require "a lot of medications, especially cardiac medications." (*Id.*). He also reported that plaintiff's "physical ability is drastically reduced because of these illnesses" and that, though "fairly well compensated" through her medications, she remained symptomatic. (*Id.*).

Thus, while Dr. Shugoll's consultative report supports that plaintiff's cardiovascular impairments improved after multiple surgeries in 1995 and the commencement of a regimen of heart medications, subsequent evidence from another Social Security consultative physician, Dr. Manejwala, suggests that her cardiovascular impairments thereafter deteriorated. At the very least, the Court finds that Dr. Manejwala's consultative findings triggered the ALJ's duty of explanation as to why cardiovascular listings 4.04 and 4.12 were not met or equaled. Without such explanation, this Court is unable to determine what analysis, if any, the ALJ performed in concluding that plaintiff's impairments did not meet the two cardiovascular listings discussed above and whether the ALJ's decision is supported by substantial evidence. *See Cook,* 783 F.2d at 1172–73. Accordingly, a remand is necessary for the ALJ to consider whether the medical evidence supports a conclusion that either of the above-noted listings have been met or equaled.

**D.** ***The ALJ Failed to Properly Evaluate Certain Medical Evidence in Reaching His Decision at Step Four.***

Plaintiff maintains that the ALJ, in concluding that she could perform her past relevant work, erred by ignoring and failing to discuss the opinions of her treating physicians, Drs. Nguyen and Nwaneri. (Paper No. 6 at 16–17). In addition, plaintiff asserts that the ALJ erred by relying instead on the opinion of a Social Security consultative physician, Dr. Manejwala. (*Id.*). According to plaintiff, in relying on Dr. Manejwala's opinion, the ALJ overlooked the fact that aspects of Dr. Manejwala's consultative report support plaintiff's allegations of disability and that an accompanying questionnaire about activity restrictions which Dr. Manejwala allegedly completed in conjunction with his report was not part of the record. (*Id.*).

It is well established that 'the opinions of treating physicians are entitled to great weight and may be disregarded only in the face of persuasive contradictory evidence. *Coffman v. Bowen,* 829 F.2d 514 (4th Cir.1987). Moreover, when evaluating the medical evidence, the ALJ should "explicitly indicate the weight given to all of the relevant evidence." *Gordon v. Schweiker,* 725 F.2d 231, 235 (4th Cir. 1984).

The Court finds no error with respect to the ALJ's consideration of Dr. Nwaneri's opinion[24] but finds that the ALJ

---

**22.** Since the time of Dr. Shugoll's examination, plaintiff had suffered a mild stroke, later attributed to generalized arteriosclerosis by Dr. Manejwala, and she had continued to complain of chest pain and shortness of breath on exertion.

**23.** Evidently a new Doppler blood flow study and treadmill test were not ordered in conjunction with this consultation. On remand, the ALJ should consider whether such tests are necessary for a proper determination of whether plaintiff meets or equals either of the pertinent cardiovascular listings. *See* 20 C.F.R., Subpt. P, App. 1, Listing 4.00(A)(2)-(3)(discussing circumstances in which purchase of Doppler study and treadmill test are appropriate).

**24.** In August 1995, a few days after plaintiff's vascular bypass surgery on her legs, Dr. Nwaneri, her treating physician, opined that

failed to provide any explanation or indication of the weight given to the opinion of plaintiff's other treating physician, Dr. Nguyen. The ALJ wrote that Dr. Nguyen opined "that plaintiff should avoid stress, exertion, and extended periods of walking or standing, and further opined that, upon mild exertion, the claimant suffers from dyspnea and angina" and that plaintiff "may suffer frequent weakness and fatigue as a consequence of her cardiac problems." (R. 14, 17). However, the ALJ fails to discuss how much, if any, weight he accorded to Dr. Nguyen's findings and opinion in concluding that plaintiff could return to her past relevant work. *See Gordon,* 725 F.2d at 235 (remanding because ALJ did not "explicitly indicate the weight given to all of the relevant evidence."); *see also DeLoatche v. Heckler,* 715 F.2d 148, 150 (4th Cir.1983)(remanding because ALJ failed to explain why he disregarded positive opinions of claimant's two treating physicians that she was totally disabled).

Moreover, the Court cannot determine from the ALJ's decision whether the ALJ considered the entire report by Social Security consultative physician, Dr. Manejwala, or only selected portions which were unfavorable to plaintiff. In any event, the ALJ's written decision, while referring to portions of Dr. Manejwala's report to rebut the severity of several of plaintiff's impairments, fails to address those portions of the report which indicate that plaintiff has significant and continuing health problems.[25] (R. 15).

Accordingly, on remand, the ALJ should specifically consider the opinions of Drs. Nguyen and Manejwala and indicate and articulate the weight given to each of their opinions in light of the entirety of the medical evidence. In this regard, the ALJ should address all aspects of Dr. Manejwala's consultative examination report.

### E. The ALJ's Credibility Determination Regarding Plaintiff's Need to Nap and Her Inability to Push and Pull Is Not Supported by Substantial Evidence.

■ Plaintiff contends that the ALJ erred in finding that her statements regarding her daily need for a two hour nap and her inability to push and pull were not entirely credible. (Paper No. 6 at 25–26). In making that determination, the ALJ found that there was a discrepancy between plaintiff's assertions and the lack of evidence that the treating or consultative physicians who had examined her had specifically indicated that she could not lift, push or pull, and should nap. (R. 17). A review of the record reveals, however, that there is no such discrepancy. Plaintiff's treating physician, Dr. Nguyen, reported in April 1997 that plaintiff should rest frequently during the day, should avoid stress and mild extended physical exertion, and would probably need to rest immediately after walking or standing for a two

---

she was totally disabled. (R. 305). In light of subsequent medical evidence that plaintiff's condition improved significantly after the surgery, the ALJ determined, however, that "Dr. Nwaneri's assessment may have had credence at the time that it was made, ... medical improvement of the claimant over time changed that assessment." (R. 11).

**25.** In his discussion of the effects of plaintiff's stroke, the ALJ wrote that "Dr. Manejwala opined that he observed no inability to move any of her extremities and her coordination and reflexes were normal." (R. 15). With respect to plaintiff's alleged stroke-related memory problem, the ALJ wrote that "Dr. Manejwala observed that she did appear

somewhat slow in her comprehension and responses, but opined that she was able to explain everything when given enough time." (*Id.*). On the issue of plaintiff's need to nap, the ALJ wrote that "Dr. Manejwala did not make note of any complaints regarding the need for a daily 2 hour nap." (R. 17).

On the other hand, the ALJ's written decision fails to discuss Dr. Manejwala's findings that plaintiff had anterior artery, left atria and left ventricle abnormalities as found by an electrocardiogram; that plaintiff's stroke may have been caused by generalized arteriosclerosis; and that plaintiff's physical ability was "drastically reduced" by her illnesses. (R. 362–64).

hour period. (R. 352–54). Dr. Nguyen found that plaintiff suffered from frequent weakness and fatigue as a result of her heart problems. (R. 352–54). Dr. Nguyen also noted that plaintiff suffered shortness of breath and chest pain upon mild exertion. (R. 353). These statements are not inconsistent with plaintiff's testimony. Therefore, the Court concludes that the ALJ's decision is not supported by substantial evidence insofar as he relied on this alleged inconsistency as a basis for rejecting plaintiff's assertions regarding her need to nap and inability to push and pull.

In addition, whether plaintiff's testimony is supported by the June 1997 consultative examination performed by Dr. Manejwala is open to conjecture because Dr. Manejwala's activity level form did not become part of the record although it clearly should have.[26] *See* 20 C.F.R. § 404.1519p (if report of consultative examiner is incomplete, regulations state that Social Security Administration will contact examining physician and ask that missing information be furnished). The activity level form may have been favorable to plaintiff given that Dr. Manejwala's report otherwise noted that "her physical ability [was] drastically reduced" and that she remained symptomatic as a result of her cardiovascular impairments. (R. 364). On remand, the ALJ should obtain the activity level form completed by Dr. Manejwala and reconsider plaintiff's testimony about her need to nap and inability to push and pull in light of all of the evidence of record.

### F. The ALJ Erred in Finding that Plaintiff Could Perform Her Past Relevant Work as a Bill Collector.

■ Plaintiff contends that her past relevant work as a bill collector, which the ALJ found she could still perform, is beyond her RFC for sedentary work.[27] (Paper No. 6 at 16). Specifically, plaintiff alleges that the job of bill collector is exertionally light work[28] and that there is no evidence in the record to support that this job can be performed with the option to sit or stand as needed. (Paper Nos. 6 at 16; 10 at 5–6).

The ALJ found that plaintiff retained the RFC for sedentary work but that she was "not able to sit, stand or walk for prolonged periods, and therefore must be able to alternate between sitting and standing." (R. 19). He concluded that she could return to her past relevant work as a bill collector or adjustment clerk because this work "did not require the per-

---

26. The Commissioner agrees that Dr. Manejwala's report references a questionnaire about activity levels and notes that neither the certified record nor the claims folder contain the activity form. (Paper No. 7 at 13 n. 12).

27. 20 C.F.R. § 404.1567(a) defines sedentary work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."

28. To support her argument, plaintiff relies on a Dictionary of Occupational Titles ("DOT") listing entitled "Collector" (alternative titles of bill collector; collection agent; outside collector), DOT Code 241.367–010,

which is classified as light work. (Paper No. 6 at 16).

In opposition, the Commissioner cites to a similarly entitled DOT listing, "Collection Clerk" (alternate titles of delinquent-account clerk; past-due-accounts clerk), DOT code 241.357–010, which is classified as sedentary work.

Even if this Court were to agree that the "Collection Clerk" listing cited by the Commissioner more accurately reflects plaintiff's own testimony and written description of her work as a bill collector than the light work-rated "Collector" job listing cited by plaintiff, there is no indication in the ALJ's written decision that he relied on the DOT. Rather, the ALJ's written decision leads the Court to conclude that he relied exclusively on the testimony of a vocational expert to reach his step four determination. Therefore, the "Collection Clerk" listing cited by the Commissioner does not explain the ALJ's decision.

formance of work functions precluded by her medically determinable impairments." (R. 21).

A review of the ALJ's written decision reveals that the ALJ relied on the testimony of a vocational expert for his conclusion that plaintiff's work as a bill collector or adjustment clerk was sedentary and could be performed with a sit/stand option. (R. 19–20). At step four, such reliance on vocational expert testimony is not permitted. *See Smith v. Bowen*, 837 F.2d 635, 637 (4th Cir.1987)(ALJ may not rely on vocational expert testimony in making findings at step four of the sequential analysis). Accordingly, a remand is necessary so that the ALJ can make his findings at step four without relying on vocational expert testimony.[29]

### VI. *Conclusion*

For the foregoing reasons, a separate Order will be entered granting plaintiff's motion for summary judgment; denying defendant's motion for summary judgment; and remanding this matter for further agency consideration in accordance with this opinion.

### *ORDER*

For the reasons stated in the foregoing Memorandum, it is this 12th day of June 2000, hereby **ORDERED** that:

1. The Plaintiff's Motion for Summary Judgment (Paper No.6) is **GRANTED**;

2. The Defendant's Motion for Summary Judgment (Paper No. 7) is **DENIED**;

3. This case is **REMANDED** to the Social Security Administration for further proceedings consistent with the foregoing Memorandum; and

4. The Clerk shall **MAIL** copies of this Order and the accompanying Memorandum to counsel of record.

---

29. Of course, it may be unnecessary to reach step four if the ALJ on remand finds that the plaintiff meets a cardiovascular listing at step three and, therefore, is disabled.